# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 2, 2000 Session

## CYNTHIA MITCHELL BARNETT v. BARBARA NAN BEHRINGER, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 98-1261-III      Ellen Hobbs Lyle, Chancellor**

---

**No. M1999-01421-COA-R3-CV - Filed May 27, 2003**

---

This appeal involves a dispute between the owners of units in a duplex arising out of the plans of one owner's tenants to build a free-standing storage building on her lot. The owner who opposed the storage building filed suit in the Chancery Court for Davidson County seeking an injunction against violating restrictive covenants and zoning regulations, as well as damages for trespass. The trial court granted the defendant owner's and tenants' motion for summary judgment and dismissed the complaint. On this appeal, the owner who objected to the storage building asserts that material factual disputes should have prevented the trial court from granting the summary judgment and that her neighbor and her neighbor's tenants had not demonstrated that they were entitled to a judgment as a matter of law. We have determined, as a matter of law, that the proposed storage building does not violate the restrictive covenants or applicable zoning regulations and that the plaintiff is not entitled to injunctive relief. Accordingly, we affirm the summary judgment dismissing the complaint.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

D. Kirk Shaffer and Christine J. Laird, Nashville, Tennessee, for the appellant, Cynthia Mitchell Barnett.

Beth A. Dunning, Nashville, Tennessee, for the appellees, Barbara Nan Behringer, Cheryl Williams, and Michael Williams.

## OPINION

### I.

Cynthia M. Barnett and Barbara Behringer own adjoining units in a duplex in a residential subdivision called La-Belle Villa located in the Hillsboro Village community of Nashville. Neither Ms. Barnett nor Ms. Behringer lives in her unit. Ms. Behringer rents her unit to her daughter and son-in-law, Cheryl and Mike Williams. Mr. Williams is a self-employed carpenter. He and a partner

operate Holland-Williams Residential Maintenance, a company specializing in building decks and fences and other small residential projects.

In early 1998, Mr. Williams decided to build a free-standing storage structure behind the duplex on Ms. Behringer's lot. He obtained a building permit and began construction in February 1998. When Ms. Barnett drove by the property on February 28, 1998, she discovered that Mr. Williams had bulldozed the building site, constructed a chain link fence and gravel drive on Ms. Behringer's side of the property, and poured a concrete foundation for the storage shed. The construction upset Ms. Barnett,[1] and within days, her lawyer wrote a letter to Ms. Behringer and Mr. Williams demanding that the construction stop because it violated La-Belle Villa's restrictive covenants.

Mr. Williams stopped construction and within a few days submitted plans to Ms. Barnett as she had requested. He also submitted the plans to Beginnings, Inc., La-Belle Villa's developer. Beginnings, Inc. approved the plans, but Ms. Barnett did not. In fact, after informing Mr. Williams that she did not approve the plans, Ms. Barnett filed suit against both Ms. Behringer and Mr. and Mrs. Williams in the Chancery Court for Davidson County seeking an injunction against "any activities on the . . . property in violation of the restrictive covenants, including, but not limited to operating a business on or out of the property." She also requested damages for injury to her property caused by Mr. Williams's trespass.

Ms. Behringer and the Williamses responded to Ms. Barnett's complaint by denying that the proposed structure violated any restrictive covenants or zoning restrictions and by asserting that the structure would "be built with the highest quality workmanship and materials, and [that] the exterior design . . . [would] be exactly the same as the existing structures on . . . the . . . property." They also counterclaimed for the money Ms. Barnett allegedly owed them for some driveway improvements and lawn work. Following some discovery, Ms. Behringer and the Williamses moved for a summary judgment with regard to Ms. Barnett's claims. Ms. Barnett opposed the motion. The trial court granted the summary judgment and dismissed Ms. Barnett's complaint. Ms. Barnett perfected this appeal. After Ms. Barnett appealed this case, Ms. Behringer and the Williamses voluntarily dismissed their counterclaims.

## II.

The standards for reviewing summary judgments on appeal are well-settled. Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Thus, a summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion – that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001).

---

[1] Ms. Barnett apparently suspected that Mr. Williams planned to set up his woodworking tools in the structure and to use the structure for business purposes.

-2-

The party seeking a summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists and that it is entitled to a judgment as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn. 1998). To be entitled to a judgment as a matter of law, the moving party must either affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense that conclusively defeats the non-moving party's claim. *Byrd v. Hall*, 847 S.W.2d at 215 n. 5; *Cherry v. Williams*, 36 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000).

Once the moving party demonstrates that it has satisfied Tenn. R. Civ. P. 56's requirements, the non-moving party must demonstrate how these requirements have not been satisfied. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Mere conclusory generalizations will not suffice. *Cawood v. Davis*, 680 S.W.2d 795, 796-97 (Tenn. Ct. App. 1984). The non-moving party must convince the trial court that there are sufficient factual disputes to warrant a trial (1) by pointing to evidence either overlooked or ignored by the moving party that creates a factual dispute, (2) by rehabilitating evidence challenged by the moving party, (3) by producing additional evidence that creates a material factual dispute, or (4) by submitting an affidavit in accordance with Tenn. R. Civ. P. 56.07 requesting additional time for discovery. *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Byrd v. Hall*, 847 S.W.2d at 215 n. 6. A non-moving party who fails to carry its burden faces summary dismissal of the challenged claim because, as our courts have repeatedly observed, the "failure of proof concerning an essential element of the cause of action necessarily renders all other facts immaterial." *Alexander v. Memphis Individual Practice Ass'n*, 870 S.W.2d 278, 280 (Tenn. 1993).

Summary judgments enjoy no presumption of correctness on appeal. *BellSouth Advertising & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003); *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 285 (Tenn. 2001). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). We must consider the evidence in the light most favorable to the non-moving party, and we must resolve all inferences in the non-moving party's favor. *Godfrey v. Ruiz*, 90 S.W.3d at 695; *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001). When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

## III.

We turn first to Ms. Barnett's assertion that the restrictive covenants governing La-Belle Villa do not permit the construction of a storage structure like the one Mr. Williams proposes to build. The fate of this claim depends on the proper construction of the restrictive covenants. This analysis is particularly amenable to being resolved by summary judgment because the construction of restrictive covenants, like any other written contract, is a question of law. *New Covenant Baptist Church v. Sark*, No. E2000-02930-COA-R3-CV, 2002 WL 313155, at *1 (Tenn. Ct. App. Feb. 28, 2002), *perm. app. denied* (Tenn. June 24, 2002); *Maples Homeowners Ass'n, Inc. v. T & R Nashville Ltd. P'ship*, 993 S.W.2d 36, 38-39 (Tenn. Ct. App. 1998).

**A.**

We begin with the most basic of propositions. A property owner's right to own, use, and enjoy private property is fundamental. *Nollan v. California Costal Comm'n*, 483 U.S. 825, 831, 107 S. Ct. 3141, 3145 (1987); *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 545-46, 92 S. Ct. 1113, 1118-19 (1972); *McArthur v. East Tenn. Natural Gas Co.*, 813 S.W.2d 417, 419 (Tenn. 1991); *State v. Gainer*, 22 Tenn. (3 Hum.) 39, 40 (1842). Accordingly, the Tennessee Supreme Court, reflecting this country's respect for property rights later noted by Alexis de Tocqueville,[2] held that

> every proprietor of land, where not restrained by covenant or custom, has the entire dominion of the soil and the space above and below to any extent he may choose to occupy it, and in this occupation he may use his land according to his own judgment, without being answerable for the consequences to an adjoining owner, unless by such occupation he either intentionally or for want of reasonable care and diligence inflicts upon him an injury.

*Humes v. Mayor of Knoxville*, 20 Tenn. (1 Hum.) 403, 407 (1839).[3]

Landowners may sell portions of their real property and, in the process, may place restrictions on the future use of the property to benefit themselves and their grantees. *Laughlin v. Wagner*, 146 Tenn. 647, 653, 244 S.W. 475, 476-77 (1922); *Beacon Hills Homeowners Ass'n, Inc. v. Palmer Props., Inc.*, 911 S.W.2d 736, 739 (Tenn. Ct. App. 1995). When properly created, these restrictions – commonly referred to as restrictive covenants – run with the land, *General Bancshares, Inc. v. Volunteer Bank & Trust*, 44 S.W.3d 536, 540 (Tenn. Ct. App. 2000); *Maples Homeowners Ass'n v. T & R Nashville Ltd. P'ship*, 993 S.W.2d at 38, and will be binding on remote grantees when they appear in the chain of title or when the grantees actually know about the restriction when they acquired the real property. *Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904, 913 (Tenn. 1976); *Hillis v. Powers*, 875 S.W.2d 273, 274 (Tenn. Ct. App. 1993).

The law, however, does not favor restrictive covenants because they are inconsistent with a subsequent landowner's free and unrestricted use of the property. Even though the courts will enforce these covenants according to the grantor's clearly expressed intentions reflected in the language of the covenant, *Shea v. Sargent*, 499 S.W.2d 871, 873-74 (Tenn. 1973); *Maples Homeowners Ass'n, Inc. v. T & R Nashville Ltd. P'ship*, 993 S.W.2d at 39; *Lapray v. Smith*, 804 S.W.2d 87, 89 (Tenn. Ct. App. 1990), they will construe them strictly against interfering with the landowner's use of real property and will resolve all doubts in favor of the property's unrestricted

---

[2]One year after the Tennessee Supreme Court decided *Humes v. Mayor of Knoxville*, Alexis de Tocqueville published the second volume of DEMOCRACY IN AMERICA, observing that "[i]n no other county in the world is the love of property keener or more alert than in the United States, and nowhere else does the majority display less inclination toward doctrines which in any way threaten the way property is owned." ALEXIS DE TOCQUEVILLE, DEMOCRACY IN AMERICA 614 (Jacob P. Mayer ed. 1966), *available at* http://xroads.virginia.edu/~HYPER/DETOC/ch3_21.htm.

[3]Several courts have noted that the right to own and enjoy private property pre-existed the federal and state constitutions. *State v. Thompson*, 33 P.3d 213, 214-15 (Idaho Ct. App. 2001); *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 140 (Tex. 1977).

use. *Arthur v. Lake Tansi Village, Inc.*, 590 S.W.2d 923, 927 (Tenn. 1979); *General Bancshares, Inc. v. Volunteer Bank & Trust*, 44 S.W.3d at 540. The courts will also refrain from extending a restrictive covenant to any activity not clearly and expressly prohibited by its plain terms. *Turnley v. Garfinkel*, 211 Tenn. 125, 130, 362 S.W.2d 921, 923 (1962); *Beacon Hills Homeowners Ass'n, Inc., v. Palmer Props., Inc.*, 911 S.W.2d at 739.

The courts will likewise construe unambiguous restrictive covenants using the established principles used to construe written contracts. *Maples Homeowners Ass'n, Inc. v. T & R Nashville Ltd. P'ship*, 993 S.W.2d at 39; *Hicks v. Cox*, 978 S.W.2d 544, 547 (Tenn. Ct. App. 1998). Accordingly, they will refrain from using parol evidence to vary the covenant's terms or from otherwise looking beyond the covenant's language to determine its scope. *Jones v. Brooks*, 696 S.W.2d 885, 886 (Tenn. 1985); *Hicks v. Cox*, 978 S.W.2d at 548. They will, however, construe restrictive covenants fairly and reasonably, *General Bancshares, Inc. v. Volunteer Bank & Trust*, 44 S.W.3d at 540; *Waller v. Thomas*, 545 S.W.2d 745, 747 (Tenn. Ct. App. 1976), and will give the covenant's terms their natural and ordinary meaning. *Hicks v. Cox*, 978 S.W.2d at 547; *Aldridge v. Morgan*, 912 S.W.2d 151, 153 (Tenn. Ct. App. 1995).

The courts will also construe a restrictive covenant's terms in light of the context in which they appear. *Hillis v. Powers*, 875 S.W.2d at 276. When they can reasonably be construed more than one way, the courts will adopt the construction that advances the unrestricted use of the property. *Southern Adver. Co. v. Sherman*, 43 Tenn. App. 323, 327, 308 S.W.2d 491, 493 (1957). The courts will also resolve ambiguities against the party seeking to enforce the restriction, *Maxwell v. Land Developers, Inc.*, 485 S.W.2d 869, 874 (Tenn. Ct. App. 1972), *Hillis v. Powers*, 875 S.W.2d at 275, and finally they will resolve all doubts concerning a covenant's applicability against applying the covenant. *Richards v. Abbottsford Homeowners Ass'n.*, 809 S.W.2d 193, 195 (Tenn. Ct. App. 1990).

**B.**

Ms. Barnett asserts that the trial court erred by dismissing her complaint because the restrictive covenants governing La-Belle Villa authorized her to disapprove the free standing storage structure Mr. Williams planned to build on Ms. Behringer's lot. Specifically, she claims that Paragraph 17 of the restrictive covenants gives her, and La-Belle Villa's other property owners, the right to reject any modification to another owner's property that "changes the architectural massing on the property and thereby alters the existing structure on the lot." There are two flaws in this argument. First, Paragraph 17 applies only to the modification of existing structures and mentions nothing about "architectural massing." Second, the restrictive covenants explicitly vest the authority to approve the construction of new, free-standing structures with La-Belle Villa's developer, not its property owners.

Paragraph 17 of the La-Belle Villa's restrictive covenants provides:

> No owners of the lots shall modify the structure on his or her lots by
> adding a room or rooms, changing the roof lines, adding decks,
> materially changing or altering the color or making other alterations
> in the exterior appearance of the structure without the express written

approval of all of the owners of record of the lots.  The owners, in acquiring title to his or her respective lots, acknowledges that the decor, color scheme and design have been selected in such a manner to be consistent and harmonious with other homes within the area and agrees to maintain his or her lots and structure in such a manner as to maintain and perpetuate the visual harmony within the subdivision.  The owners agree that the exterior paint color scheme shall not be altered unless the color change and the change is made on both lots simultaneously.

By its plain terms, this restriction applies only to the "modification" of existing "structures."  The modifications included in this restriction are limited to "adding a room or rooms, changing roof lines, adding decks, materially changing or altering the color, or making other alternations in the exterior appearance of the structure."  It does not apply to free-standing structures that are not part of the original structure.  Accordingly, paragraph 17 cannot be stretched to apply to the disputed storage structure Mr. Williams proposes to build.

Secondly, paragraph 17 does not explicitly mention "architectural massing."  While one of Ms. Barnett expert witnesses concluded that the proposed new structure on Ms. Behringer's property altered the existing structure on the lot by "changing the architectural massing on . . . [the] lot," we have not been provided with a definition of the concept of "architectural massing."  However, it could conceivably relate to the "visual harmony within the subdivision" alluded to in paragraph 17.[4]

The vague reference to "visual harmony" in paragraph 17, cannot be reasonably interpreted to expand the property owners' refusal rights beyond the activities specifically identified in the restrictive covenant itself, such as modifying the existing structure by adding a room or rooms, changing the roof lines, adding decks, materially changing or altering the exterior color, or making other alternations to the existing structure.  Since the reference to "visual harmony" in paragraph 17 is confined to the existing structure, it too cannot provide Ms. Barnett with a legal basis for interfering with Mr. Williams's decision to build a new free-standing storage shed on Ms. Behringer's property.

---

[4]The concept of "architectural massing" may be difficult to define.  *See Harris v. Old King's Highway Reg'l Historic Comm'n*, 648 N.E.2d 1296, 1298 (Mass. App. Ct. 1995) (explaining that "an architectural designer testified that the word 'massing' cannot be defined architecturally but that he understood the term to mean a building's three dimensional qualities").  Two Carnegie Mellon University faculty members define the concept thus:

Architectural massing is the act of composing and manipulating three-dimensional forms into unified coherent architectural configuration.  During this process, the relations among massing elements are studied; this includes the relations of the building with its surrounding context and of the building with its subparts.  Massing comprises all decisions affecting the external architectural form.  It is a crucial component of design because it is the phase where a designer defines her building's identity as well as the impact of her building within its urban environment.

Omer Akin & Hoda Moustapha, *Strategic Use of Representation in Architectural Massing*, *available at* http://www.andrew.cmu.edu/user/oa04/Papers/Massing.pdf (last visited May 20, 2003). The concept has also been defined as the concentration of buildings together on one piece of land.  9 THE OXFORD ENGLISH DICTIONARY 435, 438 (2d ed. 1989).

Apart from paragraph 17, La-Belle Villa's restrictive covenants contain other approval requirements for new improvements or structures erected on the lots in La-Belle Villa.[5] Paragraph 2 provides, in part:

> No building improvement or structure of any kind shall be erected, placed, altered, or moved upon the lots in La-Belle Villa, unless and until the plans and specifications for such erection, placement, moving, alteration, or construction, together with a plat plan showing the location of the building, improvement, structure or alteration have been approved by the Developer as to proposed workmanship and materials, harmony of exterior design with existing structure, and as to location with respect to lots lines and finished grade elevation. . . The approval of the Developer herein required shall be requested and obtained before any construction, erection, placement, alteration or movement of structure has been commenced, and to be effective shall be in writing. Approval by the Developer where required under these restrictive covenants will not be unreasonably withheld.

By its plain terms, La-Belle Villa's developer, not its property owners, must approve the erection of any new building, improvement, or structure on the lots in La-Belle Villa.

The free-standing storage structure Mr. Williams planned to construct comes under paragraph 2. It is undisputed that in June 1998, Ms. Behringer and the Williamses obtained the approval of La-Belle Villa's developer to build the proposed free-standing storage structure. On these undisputed facts, we conclude, as did the trial court, that Ms. Behringer and the Williamses fully complied with the requirements in the applicable restrictive covenants regarding the approvals needed to construct the storage structure on Ms. Behringer's lot. Accordingly, the trial court properly gave judgment to Ms. Behringer and the Williamses on this point.[6]

## IV.

Ms. Barnett has two remaining arguments against Mr. Williams's proposed storage structure. First, she insists that the structure will violate paragraphs 1 and 12 of La-Belle Villa's restrictive covenants which limit the use of the buildings and lots at La-Belle Villa to residential, as opposed to commercial, uses. Second, she asserts that Mr. Williams has conceded that his proposed structure will violate paragraph 20(g) of the restrictive covenants which provides that only one residential building may be placed on each lot. We find these arguments unconvincing.

---

[5] Paragraphs 3 and 4 of the restrictive covenants specifically require the developer's approval for fences and swimming pools.

[6] Our holding that the restrictive covenants did not give Ms. Barnett the authority to approve the construction of the storage structure renders moot the parties' arguments over whether Ms. Barnett reasonably withheld her approval. Consequently, we pretermit the issue. *State v. McLerran*, 604 S.W.2d 841, 845 (Tenn. 1980) (declining to reach an issue made moot by the court's disposition of a prior legal issue).

**A.**

Before Mr. Williams began preparing the site for the storage structure, he mentioned to Ms. Barnett's husband that he was thinking about constructing a building behind his duplex to use as a workshop and as a place to store the tools he used in his residential remodeling business. Mr. Barnett was cool to the idea and suggested to Mr. Williams that he might want to move to a larger piece of land if he wanted to operate a business. Based on Mr. Williams's statements to her husband, Ms. Barnett now insists that the proposed structure will violate the restrictive covenants preventing the use of the property for commercial purposes.

It is undisputed that paragraph 1 of La-Belle Villa's restrictive covenants requires that the subdivision's lots may only be used for residential purposes. It is likewise undisputed that paragraph 12 of the restrictive covenants provides that no "business, trade, profession or commercial activity or calling of any kind shall be conducted in the building or on the lots in La-Belle Villa." Unlike the restrictions discussed in Section II(B) which relate to the structures themselves, these restrictions involve the use to which the structures are put.

The trouble with Ms. Barnett's argument based on paragraphs 1 and 12 is that she has placed the cart before the horse. These restrictions involve the uses, not the proposed uses of the property. Thus, they should not be read to prevent the construction of a structure that is just as amenable to a permitted use as it may be to a prohibited use. The structure Mr. Williams proposes to build is such a structure.

Courts ordinarily should not grant injunctions to prevent what someone might do with property when that fear involves nothing more than speculation. *White v. Gulf Ref. Co.*, 156 Tenn. 474, 477-78, 2 S.W.2d 414, 415 (1928). Speculation about the relationship between the structure Mr. Williams plans to build and his carpentry business is all Ms. Barnett can offer at this point. The conditions on the property make plain that storage building or no storage building, Mr. Williams cannot operate a business at LaBelle Villa. Should he do so, the courts may step in to enforce paragraphs 1 and 12 of the restrictive covenants. However, on the record as it presently stands, the trial court correctly declined to step in.

**B.**

Ms. Barnett concludes with her least substantial argument. She asserts that Mr. Williams's proposed structure violates paragraph 20(g) of the restrictive covenants which provides that only one "residential building" may be placed on each lot in La-Belle Villa. To support her claim, she points out that Mr. Williams himself repeatedly characterized the structure as "residential" in his deposition. While we give appropriate credit to the clever wordplay of Ms. Barnett's lawyer, Mr. Williams's characterization of the proposed structure as "residential," taken in proper context, indicates only that the structure is not "commercial." Mr. Williams never testified that any person would be living in the structure once it was built.

For the purposes of construing La-Belle Villa's restrictive covenants, the term "residential building" should be given its common and technical meaning. A residential building is a building

that is used as a dwelling place or place of habitation.[7]  While Mr. Williams frequently characterized the proposed structure as a "residential" building, the context[8] in which he used the term makes clear that he did not intend to state that the structure would be used as a dwelling place.  Rather, he was simply using the term "residential" to distinguish the structure from a commercial one.  For example:

| | |
|---|---|
| Ms. Barnett's lawyer: | Well, you insist, do you not, that the proposed building is not commercial? |
| Mr. Williams: | No, sir, it is not a commercial building. |

Later during the deposition, Mr. Williams's own lawyer brought this point out even more clearly:

| | |
|---|---|
| Mr. Williams's lawyer: | There was some - - you testified and there was some discussion among the lawyers about the provision with respect to residential buildings.  As you answered those questions, were you using - - whose definitions of residential building were you using? |
| Mr. Williams: | Mine. |
| Q. | Do you know legally whether that is the definition of what's meant in the restrictive covenants? |
| A. | No, ma'am. |
| Q. | Are you a lawyer? |
| A. | No, ma'am. |
| Q. | And your definition of residential building, what makes you determine something is a residential building? |
| A. | It being a noncommercial building. |
| Q. | And what does that mean to you? |
| A. | A building that work would not be performed out of, either part or full time. |
| Q. | So, are you defining it by its use? |
| A. | Yes. |

* * *

---

[7] BLACK'S LAW DICTIONARY 1308-09 (6th ed. 1990) (defining "residence" as "a person's dwelling place or place of habitation"); Tenn. Code Ann. § 7-62-101(3) (1998) (defining "residential building" as "a house or building used or designed to be used as the abode or home or a person, family, or household exclusively as a residence").  The Standard Building Code defines "residential occupancy" as "the use of a building or structure or any portion thereof, for sleeping accommodations not classed as a Group I occupancy [hospitals, jails, and other institutions]."  SOUTHERN BUILDING CODE CONGRESS, INC., STANDARD BUILDING CODE §§ 311.1 (1997 ed.); THOMAS J. GRIFFIN, THE REAL ESTATE MANAGER'S TECHNICAL GLOSSARY 210 (1999) (defining "residential occupancy" as "[a] use classification of a building in which sleeping accommodations are provided, with the exception of those buildings classified under institutional occupancy").

[8] Words are known by the company they keep.  *State ex rel. Comm'r of Transp. v. Medicine Bird Black Bear White Eagle*, 63 S.W.3d 734, 754 (Tenn. Ct. App. 2001).  Accordingly, as Professor White has noted, we define words partly in the way we use them.  James Boyd White, *Thinking About Our Language*, 96 Yale L.J. 1960, 1972 (1987).

Q. . . . Tell me again how you define residential building.

A. I define a residential building by what type of activities go on there.

Q. And what type of activities would make it a residential building, in your mind?

A. Anything. It being strictly - - it'd be a residence, you know, wife, children, family.

Q. Are you going to sleep in this building?

A. Which one?

Q. In the shed.

A. No.

Q. Okay. But you would still define that as a residential building?

A. Yes.

Q. But you don't have to sleep in a building for your definition of a residential building?

A. No.

Q. Okay. And you're not going to conduct any daily living activities in this building?

A. No.

Q. As in eating, sleeping, washing clothes?

A. No, ma'am.

When we consider Mr. Williams's use of the term "residential" in context, it becomes obvious that Ms. Barnett's argument that Mr. Williams seeks to put an additional residence on Ms. Behringer's lot is pure wordplay. We easily find that Ms. Barnett has created no real issue of material fact regarding the planned structure's compliance with paragraph 20(g) of La-Belle Villa's restrictive covenants.

## V.

We affirm the judgment dismissing Ms. Barnett's complaint and remand the case to the trial court for whatever further proceedings may be required. We tax the costs of this appeal to Cynthia Mitchell Barnett and her surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

-10-