James E. RICHARDS and Barbara H. Richards, Plaintiffs/Appellants,

v.

ABBOTTSFORD HOMEOWNERS ASSOCIATION, Defendant/Appellee.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Dec. 28, 1990.

Permission to Appeal Denied by Supreme Court April 29, 1991.

Dennis J. Meaker, Waller, Lansden, Dortch & Davis, George Cate, Jr., Nashville, for plaintiffs/appellants.

William A. Cragg, Douglas A. Brace, Ortale, Kelley, Herbert & Crawford, Nashville, for defendant/appellee.

OPINION

KOCH, Judge.

This appeal arises out of a dispute concerning the assessment of maintenance fees at an exclusive planned unit development in Nashville. The owners of a home built on two consolidated lots filed an action in the Chancery Court for Davidson County, seeking a declaration that the development's restrictive covenants did not permit the homeowners' association to assess a maintenance fee on each lot. The

trial court, sitting without a jury, found that the homeowners were required to pay maintenance fees on both lots because they had not obtained the homeowners' association's approval to consolidate their lots. On this appeal, the homeowners take issue with the trial court's interpretation of the restrictive covenants. We find that the trial court misconstrued the covenants dealing with the assessment of maintenance fees and, therefore, reverse the judgement.

## I.

Abbottsford is an exclusive planned unit development located on 38 acres in the Green Hills section of Nashville. On April 19, 1985, its developer, Abbott Martin Corporation, recorded the development's plat and Declaration of Covenants, Conditions and Restrictions in the register of deeds' office. Both the plat and the declaration of covenants showed that Abbottsford, as originally designed, contained 129 lots varying between 5,200 and 15,000 square feet in size.

As is customary with projects of this sort, the declaration of covenants contained provisions relating to the transition of management responsibility between the developer and the homeowners' association. It also contained routine provisions permitting the assessment of periodic fees for the maintenance, landscaping, and beautification of the common areas. These provisions are at the heart of this case.

In March, 1987, James and Barbara Richards bought a house in Abbottsford that was already under construction. They also bought the adjoining lot where they intended to build a swimming pool, pool house, and gardens. The declaration of covenants required the Richards to obtain the developer's approval for the pool since, at that time, the development had not been turned over to the homeowners' association.[1] Therefore, the Richards presented their

plans for the pool to Fred R. Webber, Jr., the president of the company developing Abbottsford. Mr. Webber approved the plans and authorized the Richards to construct the pool, pool house, and gardens on the lot next to their house.

Several months later, the Abbottsford Homeowners' Association was established. Mr. Webber relinquished control of the development in May, 1987. The residents elected the association's first board of directors in June, 1987 and held their first association meeting one month later. The Richards did not seek the association's approval for their pool since they had already obtained Mr. Webber's approval.

The Richards' contractor could not begin the pool because the city would not issue a building permit until the Richards' two lots were consolidated into a single lot.[2] On October 20, 1987, the planning commission approved consolidating the lots, and the Richards' engineer filed a plat in the register's office showing that the two lots had been consolidated into a single 13,160 square foot lot. The plat stated specifically that "the recording of this plat void[s], vacates and supersedes the recording of lots 408 and 134." Once the plat was filed, the Richards' contractor constructed the pool and other improvements.

The Richards ceased paying two maintenance fees in January, 1988. In February, 1988, Abbottsford's management company, at the direction of the homeowners' association, notified them that their maintenance fee account was delinquent and that a lien would be placed on their property if the account was not made current within ten days. The Richards explained to the management company, and later to the board of directors, that they had obtained the developer's approval to build their pool and that their two lots had been consolidated into a single lot. When the home-

---

1. Article VI, Section 2, paragraph 5 of the declaration of covenants states: "Unless otherwise approved by Developer, swimming pools must be located to the rear of the main dwelling and shall be no nearer than five (5) feet to any Site line."

2. The city's position apparently stemmed from a provision in Abbottsford's declaration of covenants stating that each "Site" or "Lot" must be used for "single-family residential purposes." In the city's view, constructing a pool and pool house on a separate lot was not using the lot for single-family residential purposes.

owners' association continued to insist on the payment of two maintenance fees, the Richards filed suit to obtain a declaration of their rights under the declaration of covenants.

## II.

Both parties rely upon Abbottsford's declaration of covenants to support their positions. Thus, we must look first to the declaration of covenants itself to resolve this dispute.

### A.

Covenants such as the one involved in this case are valid and are binding on all purchasers with notice. *Ridley v. Haiman,* 164 Tenn. 239, 246–47, 47 S.W.2d 750, 753 (1932); *Laughlin v. Wagner,* 146 Tenn. 647, 653, 244 S.W. 475, 476–77 (1922). They are, however, strictly construed because they are in derogation of a property owners right of unrestricted use of their property. *Land Developers, Inc. v. Maxwell,* 537 S.W.2d 904, 918 (Tenn.1976); *Shea v. Sargent,* 499 S.W.2d 871, 872–73 (Tenn.1973).

Like other contracts, covenants should be enforced according to the parties' clearly expressed intentions. *Waller v. Thomas,* 545 S.W.2d 745, 747 (Tenn.1976); *Hamilton v. Broyles,* 57 Tenn.App. 116, 123–24, 415 S.W.2d 352, 355 (1966). They should be interpreted in light of their fair and reasonable meaning, *McDonald v. Chaffin,* 529 S.W.2d 54, 57 (Tenn.1975), but should not be extended to cover circumstances not plainly included within their terms. *Turnley v. Garfinkel,* 211 Tenn. 125, 130, 362 S.W.2d 921, 923 (1962); *Southern Advertising Co. v. Sherman,* 43 Tenn.App. 323, 326–27, 308 S.W.2d 491, 493 (1958). All doubts concerning a covenant's applicability should be resolved against the covenant. *See Land Developers, Inc. v. Maxwell,* 537 S.W.2d at 918.

### B.

The mechanics of Abbottsford's maintenance assessments are set out in detail in the declaration of covenants. In order to maintain the development's common areas and shared amenities, the declaration of covenants provides for periodic maintenance assessments against each "lot" or "site" and requires all property owners to pay these assessments in the manner required by either the declaration of covenants or by the board of directors of the homeowners' association. *See* Covenant for Maintenance Assessments, Article V, Section 1.

The maintenance assessments are governed by the declaration of covenants as long as the developer controls the property. After the homeowners' association assumes control of the development, however, its board of directors has the sole authority to set the maintenance assessments and to define the manner of their payment. *See* Covenant for Maintenance Assessments, Article V, Section 7.

The record reveals little concerning the manner in which the board of directors has used its authority to set Abbottsford's maintenance fees. Prior to July, 1987, the Abbott Martin Corporation assessed and collected a $100 per month maintenance fee from the purchasers of each lot. *See* Covenant for Maintenance Assessments, Article V, Section 5. Apparently the board of directors continued the $100 monthly maintenance fee after it assumed control of the development in July, 1987 and also established a $25 late payment penalty for maintenance assessments postmarked after the tenth day of each month.[3]

### C.

■ At the heart of this dispute is the parties' disagreement concerning how to identify the lots that are subject to assessment for maintenance fees. The homeowners' association asserts that the declaration of covenants requires the assess-

---

**3.** The record does not contain the formal minutes of board of directors' actions with regard to the maintenance assessments. However, these actions are alluded to in Abbottsford's manage-

ment company's March 1, 1988 letter demanding that the Richards bring their maintenance fee account current.

ment of maintenance fees on each of the 129 lots originally identified in the plat of Abbottsford filed in April, 1985. On the other hand, the Richards assert that the maintenance fee should be assessed only on the lots identified on the most current plat on file when the maintenance fees become due. We find the Richards' interpretation to be more compatible with the declaration of covenants and with Abbottsford's conduct prior to this dispute.

Article V, Section 7 of the declaration of covenants requires the owners of "all Sites" to pay maintenance fees after the homeowners' association assumed control of the development. The declaration of covenants defines "site" or "lot" as

> any plot of land to be used for single-family residential purposes and so designated on the subdivision plat or survey of Abbottsford which shall be of public record, or ownership of any condominium within Abbottsford under unit ownership arrangement or agreement. .

The definition refers to the "subdivision plat or survey" without specifically identifying which plat or survey should be used.

■ The word "plat" is a term of art in the planning profession that generally refers to a subdivision map prepared for approval by a governmental authority. *Sellon v. City of Manitou Springs,* 745 P.2d 229, 233–34 (Colo.1987). It connotes the map depicting the manner in which property has been subdivided. *McKain v. Toledo City Plan Comm'n,* 26 Ohio App.2d 171, 270 N.E.2d 370, 373 (1971). The term has a similar meaning in Tennessee's statutes governing municipal planning regulations. Tenn.Code Ann. § 13–4–301(2) (Supp.1990) provides that a "plat" includes a "plat, plan, plot or replot."

■ Since the statutory definition of "plat" includes "replots," we find that Abbottsford's plat consists not only of its original plat filed in April, 1985 but also all later plats amending the original plat. Under our regulatory scheme, a subdivision can have only one plat. It is evident from the language of the later plats in this case that they were intended to take the place of the portion of the original plat they amended.

■ Abbottsford's declaration of covenants should be interpreted to make them consistent with the planning statutes. In the absence of a specific, clear intention to limit the meaning of "subdivision plat" to the plat filed in April, 1985, we find that the term "subdivision plat," as it is used in the declaration of covenants, refers to the plat of Abbottsford that incorporates all the otherwise valid amendatory plats filed since the recording of the original plat. At the time the 1988 maintenance assessments became due, Abbottsford's plat showed that the Richards' house was located on only one "lot" or "site." Accordingly, the homeowners' association was only entitled to collect one maintenance fee from the Richards, not two.

Our conclusion is consistent with the development's own interpretation of the declaration of covenants prior to this dispute. In September, 1985, another individual purchased five adjoining lots in Abbottsford and, with the developer's approval, consolidated the five lots into four larger ones. Like the Richards, he filed a revised plat that "superseded" the original plat with regard to the five lots. Thereafter, the purchaser sold three of the lots to others and built his own house on the fourth lot.

Both the developer and the homeowners' association assessed a single maintenance fee against each of the four remaining lots. It was only after this dispute arose that the homeowners' association sought the voluntary agreement from the four property owners to pay their prorated share of the maintenance fee on the fifth lot that had been consolidated into the other four lots three years earlier.

This court attaches weight to the parties' own interpretation of their agreement. *Fidelity–Phenix Fire Ins. Co. v. Jackson,* 181 Tenn. 453, 466–67, 181 S.W.2d 625, 631 (1944); *Ballard v. North Am. Life & Casualty Co.,* 667 S.W.2d 79, 84 (Tenn.Ct.App. 1983). In light of the homeowners' association's conduct, and in the absence of specific language in the declaration of covenants

to the contrary, we find that the declaration of covenants did not require that maintenance fees be assessed on the lots depicted on Abbottsford's original plat.

### D.

Article V, Section 7 of the declaration of covenants gives the board of directors of the homeowners' association broad authority to set the amount and manner of payment of Abbottsford's maintenance fees. While the fees must be assessed on each "lot" or "site," the board of directors is free to define "lot" or "site" and to apportion the maintenance fees using any reasonable criteria, including lot size, usage, or even the development's original configuration.

For the purposes of this case, however, we have before us no evidence that the board of directors has formally decided to impose maintenance fees based on Abbottsford's April, 1985 plat. The declaration of covenants does not clearly contemplate that maintenance fees will be assessed according to the April, 1985 plat.[4] Therefore, until it formally decides to the contrary, the board of directors must base Abbottsford's maintenance assessments on the plat in existence at the time the assessments become due.

### III.

We reverse the judgment and remand the case to the trial court for the entry of an order consistent with this opinion. We tax the costs in equal proportions against the Abbottsford Homeowners' Association and James E. Richards and their respective sureties for which execution, if necessary, may issue.

LEWIS and CANTRELL, JJ., concur.

---

**4.** At one point during this dispute, the homeowners' association sought to support their position with Article III, Section 3 relating to a purchaser's acceptance of the development. This section has no application to the covenant for maintenance assessments contained in Article V.