240 S.W.3d 840 (2007)
METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY
v.
BARRY CONSTRUCTION COMPANY, INC. et al.
Court of Appeals of Tennessee, at Nashville.
April 5, 2006 Session.
February 21, 2007.
Order Denying Petition for Rehearing March 14, 2007.
Permission to Appeal Denied August 13, 2007.
*842 J. Brooks Fox and John Kennedy, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville and Davidson County.
Christopher W. Cardwell and Mary Beth Hagan, Nashville, Tennessee, for the appellee, Barry Construction Company, Inc.
Shawn R. Henry, Nashville, Tennessee, for the appellee, JCH Development Company, Inc.
Permission to Appeal Denied by Supreme Court August 13, 2007.

OPINION
WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.
This appeal arises from a dispute involving an unfinished public road in a large residential and commercial development in southeast Davidson County. The road was an integral part of the plans used by the developers to induce the city to rezone the property to accommodate the project and to approve the planned unit development overlay. After the developers declined to complete the road, the Metropolitan Government of Nashville and Davidson County filed suit in the Chancery Court for Davidson County seeking to force the developers either to complete the road or to pay damages equal to the cost that city would incur if it completed the road itself. The trial court dismissed the city's complaint after concluding that the city had failed to provide any legal basis for requiring the developers to complete the road. The city appealed. We have determined that the ordinance approving the rezoning of the property to accommodate the development provides sufficient legal basis to require the developers to complete the road.

I.
In 1988, JCH Development Co., Inc. (JCH) developed a proposal to build four hundred new residences, a retail shopping facility, and two community centers on an undeveloped site in southeast Davidson *843 County. The project, named "Long Hunter Chase," was bounded on the north by Mt. View Road and on the south by Hobson Pike, two major transportation arterials in the area. JCH could not begin construction without first convincing the Metropolitan Council[1] to rezone the property[2] and then obtaining the approval of the planned unit development (PUD) district overlay from both the Metropolitan Planning Commission[3] and the Council.[4]
As required by the zoning ordinance, JCH prepared and submitted a preliminary master development plan (preliminary master plan)[5] in conjunction with its request for rezoning and adoption of the PUD district overlay.[6] The preliminary master plan included features designed to *844 mitigate the traffic impacts of the massive development on the surrounding area. Specifically, it called for the construction of a new north-south road named "Smith Springs Parkway." The purposes of the road were to provide a direct connection between Mt. View Road and Hobson Pike through the western portion of the development and to divert traffic from the residential streets. JCH agreed to pave the road to a width of thirty feet, to dedicate the road and an eighty-foot-wide right of way to Metro, and to install thirty-five-foot-wide landscape buffers on either side of Metro's eighty-foot-wide right of way. The preliminary master plan expressly assigned Metro the responsibility for any future widening of the road within the right of way.
The Planning Commission approved the preliminary master plan on August 4, 1988. Two months later, on October 18, 1988, the Council amended the comprehensive zoning ordinance to rezone the property to R15 and to apply the PUD district overlay as envisioned in the preliminary master plan. Metro Ordinance 88-491 (Oct. 18, 1988).[7] The Council ordered that the official zoning map be amended to reflect these changes and directed that the ordinance be published in a local newspaper of general circulation. Metro Ordinance 88-491 §§ 2-3.[8] The Council explicitly incorporated the requirements of the preliminary master plan into the new zoning of the property. Metro Ordinance 88-491 § 1.
Following Council approval of the preliminary master plan, JCH submitted a final master development plan (final master plan) for Phase I[9] for review by the Planning Commission.[10] The final master plan for Phase I included the entire length of Smith Springs Parkway. The Planning Commission approved the final master plan for Phase I on June 8, 1989. Council approval was not required.[11] However, construction of Phase I did not begin immediately. In fact, it was not until June 1992 that JCH finally submitted detailed construction plans for Phase I for review by the various Metro agencies. Like the final master plan, the construction plans showed all of Smith Springs Parkway as part of Phase I of the project.
In December 1993, JCH agreed to sell Phase I to another developer, Barry Construction Co. (Barry Construction). JCH conveyed half of Phase I to Barry Construction immediately and granted Barry Construction a twelve-month option to purchase the other half. JCH agreed to secure and pay for all governmental approvals necessary for the development of Phase I up to and including approval of *845 the final subdivision plats,[12] while Barry Construction agreed to bear the cost of all "Development." The purchase agreement defined the word "Development" to include "the construction of roads . . . required by plans and specifications as approved by all appropriate persons and governmental authorities." Barry Construction exercised the option to purchase the second half of Phase I on December 1, 1994. Thus, by the end of 2004, Barry Construction owned all of Phase I of the project.
As required by the purchase agreement, JCH prepared final subdivision plats for both parts of Phase I and provided them to Barry Construction. Because of the configuration of the project, Phase I, section 1 included only the north and south ends of Smith Springs Parkway. The middle part of the road, a stretch approximately one thousand feet long, was part of Phase I, section 2. The final subdivision plats showed unmistakably that Phase I was intended to include all of Smith Springs Parkway. The Planning Commission approved the final subdivision plat for Phase I, section 1 on November 7, 1994, and Barry Construction recorded it later the same day. Barry Construction then built out Phase I, section 1, including the construction and paving of the north and south ends of Smith Springs Parkway.
Several years later, when it came time to build out Phase I, section 2 of the project, Barry Construction did a very strange thing. Instead of simply submitting JCH's final subdivision plat for Phase I, section 2 which Barry Construction had in its possession, for review and approval, Barry Construction hired another company, Site Engineering Consultants, to draw up new final subdivision plats dividing Phase I, section 2 into two parts  Phase I, section 2 and Phase I, section 3. Mysteriously, neither of these new final subdivision plats for Phase I included the middle one-thousand-foot stretch of Smith Springs Parkway necessary to connect the north and south ends of the road and to provide a direct connection through the development between Mt. View Road and Hobson Pike.
Apparently the city employees did not discover the omission of the uncompleted portion of Smith Springs Parkway. Thus, despite the omission, the Planning Commission approved Barry Construction's final subdivision plats for Phase I, section 2 and Phase I, section 3 on July 1, 1998 and July 7, 1999, respectively.[13] Barry Construction recorded the final subdivision plats and posted performance bonds guaranteeing the construction of all public improvements *846 associated with the development of sections 2 and 3 of Phase I.[14] Because the performance bonds were based on the final subdivision plats, they did not guarantee the construction of the missing one-thousand-foot section of Smith Springs Parkway. It was not until early 2004, when Barry Construction was nearing the completion of Phase I, that the Planning Commission staff finally realized that neither Barry Construction nor JCH intended to complete Smith Springs Parkway.
Metro filed suit against Barry Construction in the Chancery Court for Davidson County on April 20, 2004 claiming that Barry Construction's failure to construct the missing portion of Smith Springs Parkway constituted a breach of the performance bonds, contravened the Planning Commission's subdivision regulations, and violated a condition of the approval of the final subdivision plats for Phase I, section 2 and Phase I, section 3. Metro sought an order compelling Barry Construction to construct the missing portion of Smith Springs Parkway or, in the alternative, an award of damages equal to the amount it would incur in completing the road itself. Barry Construction filed its answer on June 1, 2004 denying any responsibility for the construction of the missing section of Smith Springs Parkway.
On the same day that Barry Construction filed its answer, John Coleman Hayes, Jr., the president of JCH, met with Planning Commission staff regarding approval of the final subdivision plat for the last section of Phase III on the eastern side of the project. The staff informed Mr. Hayes that Barry Construction had "platted around" the middle one-thousand-foot stretch of Smith Springs Parkway. On June 10, 2004, the Planning Commission approved the final subdivision plat for Phase III, section 3, but only on the condition that JCH construct the missing portion of Smith Springs Parkway in Phase I of the project.[15]
On November 4, 2004, Barry Construction filed a motion for partial summary judgment on the ground that it had no obligation to construct the missing one-thousand-foot piece of Smith Springs Parkway. In support of its motion, Barry Construction submitted the affidavit of Andrew B. DiMartino, the licensed land surveyor who prepared the final subdivision plats for Phase I, section 2 and Phase I, section 3. Mr. DiMartino asserted that the performance bonds, which were based on the final subdivision plats, did not include the missing portion of Smith Springs Parkway. He claimed that Barry Construction had constructed and maintained all roads required by the final subdivision plats and guaranteed by the performance bonds. Mr. DiMartino offered no explanation for his omission of the middle one-thousand-foot *847 stretch of Smith Springs Parkway in the drafting of the final subdivision plats.
On December 3, 2004, Metro filed a motion to amend the complaint to add JCH as a defendant. In the amended complaint, Metro abandoned its claims based on the performance bonds and final subdivision plats for sections 2 and 3 of Phase I. Metro reiterated its contention that the developers' failure to construct the missing portion of Smith Springs Parkway violated the subdivision regulations. Moreover, Metro asserted for the first time that the Council ordinance approving the PUD district overlay was conditioned on the construction of the entire length of Smith Springs Parkway. Metro requested an order compelling Barry Construction and JCH to construct the missing one-thousand-foot stretch of Smith Springs Parkway or, in the alternative, an award of damages equal to the amount it would cost Metro to complete the road.
On January 4, 2005, the trial court entered orders granting Metro's motion to file an amended complaint and granting in part Barry Construction's motion for partial summary judgment. The trial court accepted Metro's concession that the performance bonds for Phase I, section 2 and Phase I, section 3 did not encompass the missing one-thousand-foot stretch of Smith Springs Parkway and therefore could not furnish a basis for relief against Barry Construction. The trial court specifically reserved the remaining issues raised by the amended complaint and ordered that the case proceed.[16]
Barry Construction moved to dismiss the amended complaint on March 17, 2005. The trial court granted the motion on April 26, 2005. In its brief order, the court concluded that the subdivision regulations relied on by Metro did not require Barry Construction to construct the missing portion of Smith Springs Parkway. The court did not address Metro's additional argument that Barry Construction was required to complete the road because the Council based its approval of the PUD district overlay on the construction and paving of the new road. JCH filed its own motion to dismiss on May 11, 2005 followed by a June 7, 2005 motion for summary judgment. Meanwhile, Metro filed a motion under Tenn. R.App. P. 9 for permission to pursue an interlocutory appeal and a motion to revise the order dismissing the amended complaint against Barry Construction.
The trial court set a final hearing on all motions for June 24, 2005. Four days before the hearing, Metro filed a motion for permission to file a second amended complaint. The proposed second amended complaint cited numerous provisions of the current and previous zoning codes and sought to add causes of action for "estoppel" and breach of implied contract. On July 6, 2005, the trial court entered a final order granting JCH's motion for summary judgment. The court stated that it could find no basis for imposing a legal duty on JCH to begin or complete construction of Smith Springs Parkway. The court denied Metro's motion to revise the order dismissing Barry Construction, its motion to pursue an interlocutory appeal, and its motion to file a second amended complaint. Metro appealed.

II.
The trial court determined that the authorities cited in the amended complaint did not provide a legal basis for requiring *848 either developer to build the missing section of Smith Springs Parkway. This determination formed the basis for both the order dismissing the amended complaint against Barry Construction[17] and the summary judgment in favor of JCH.[18] Both rulings present the same legal question, i.e., whether the authorities cited in the amended complaint provide a legal basis for requiring either or both developers to build and pave the missing section of Smith Springs Parkway. We review the trial court's resolution of questions of law de novo both in the summary judgment context, BellSouth Adver. & Publ'g Co. v. Johnson, 100 S.W.3d 202, 205 (Tenn.2003); Scott v. Ashland Healthcare Ctr., Inc., 49 S.W.3d 281, 285 (Tenn.2001), and in the context of an order dismissing a complaint for failure to state a claim upon which relief can be granted, Conley v. State, 141 S.W.3d 591, 594-95 (Tenn.2004); Stein v. Davidson Hotel Co., 945 S.W.2d 714, 716 (Tenn.1997).

III.
The key issue in this appeal is whether the trial court correctly determined that Metro failed to put forward a viable legal argument for requiring either JCH or Barry Construction to finish Smith Springs Parkway. Admittedly, Metro has done a poor job of pleading its case and articulating the legal basis for its claims against JCH and Barry Construction both in the trial court and in this court. As Barry Construction points out in its brief on appeal, it was Metro's responsibility, as the plaintiff, to plead its case.[19] Moreover, Metro's filings, even on appeal, reflect fundamental misconceptions regarding the operation of, and interrelationship among, the comprehensive zoning ordinance, the current zoning code, the subdivision regulations, and the Planning Commission's statutory authority to approve subdivision plats.
Nevertheless, after careful deliberation, we have concluded that Metro's amended complaint recites an adequate legal basis for requiring both developers to complete Smith Springs Parkway. Metro's amended complaint relies not only on the current zoning code and the subdivision regulations  which the trial court considered and rejected  but also on the Council's original ordinance[20] rezoning the property and applying the PUD district overlay  which the trial court apparently did not consider. As explained below, we have determined that the Council's ordinance approving the project provides a sufficient legal basis for requiring both developers to build and pave the missing section of Smith Springs *849 Parkway.[21]

A.

JCH's OBLIGATION TO CONSTRUCT SMITH SPRINGS PARKWAY
In 1988, the Metro Council adopted Ordinance Number 88-491 at JCH's request. The 1988 ordinance amended the zoning ordinance and the official zoning map with respect to all the property included in the Long Hunter Chase project. It rezoned the land from an AR2a zoning district to an R15 zoning district and applied a PUD district overlay based on JCH's preliminary master plan. The ordinance specifically referred to and incorporated the "lines, words and figures on the attached sketch," the attached sketch being the preliminary master plan. Metro Ordinance 88-491 § 1. The preliminary master plan consisted of a series of maps, all of which reflected the construction of a new "Smith Springs Parkway" in the western portion of the project. Each map comprising the preliminary master plan contained the following notation with an arrow pointing to Smith Springs Parkway: "30' Pavement Section by This Developer  Future by Metro."
The ordinance and the attached preliminary master plan show inescapably that JCH agreed to build and pave to a width of thirty feet the entire length of Smith Springs Parkway in return for the Council's rezoning of the property and application of the PUD district overlay. The comprehensive zoning ordinance specifically contemplated this type of exchange.[22] Moreover, binding legal agreements regarding the specific elements of a development are characteristic of PUDs generally.[23] When the Council accepted JCH's *850 offer by adopting the ordinance applying the PUD district overlay, JCH incurred a legally enforceable obligation to ensure that Smith Springs Parkway was built and paved during the course of the development of the project. Hovenden v. City of Gallatin, No. 01A01-9508-CH-00383, 1996 WL 99800, at *1 (Tenn.Ct.App. Mar.8, 1996), perm. app. denied (Tenn. May 28, 1996); Redbud Coop. Corp. v. Clayton, 700 S.W.2d 551, 559 (Tenn.Ct.App.1985).[24] As long as the project went forward, JCH had a legal duty to make sure that this condition of development was satisfied.[25]
JCH contends that its transfer of all the land in Phase I to Barry Construction somehow terminated its legal obligation to build and pave Smith Springs Parkway. JCH cites no legal authority in support of this novel proposition. We fail to see how JCH could, as it claimed in the trial court, simply "contract away" its legal obligation to ensure the implementation of the mitigation measures that it proposed and the Council adopted in approving the PUD district overlay. Nothing in the comprehensive zoning ordinance or the current zoning code supports this notion. Accordingly, we reject JCH's claim that its transfer of Phase I to Barry Construction terminated its legal obligation to ensure the construction and paving of all of Smith Springs Parkway.

B.

BARRY CONSTRUCTION'S OBLIGATION TO CONSTRUCT SMITH SPRINGS PARKWAY
Barry Construction offers two main arguments in support of its position that it bears no legal responsibility for the construction and paving of the missing section of Smith Springs Parkway. First, Barry Construction claims that Metro has advanced no legal authority requiring it to build and pave the new road. Second, Barry Construction argues that the Planning Commission's approval of the final subdivision plats for Phase I, section 2 and Phase I, section 3 absolved it of any responsibility for the missing section that it might otherwise have had.[26] We find these arguments unpersuasive.
As explained above, the Council expressly incorporated the "lines, words and figures" of JCH's preliminary master plan into the zoning of the property. Metro *851 Ordinance 88-491 § 1. The "lines, words and figures" of the preliminary master plan unambiguously require the construction and paving of all of Smith Springs Parkway as part of the development of Long Hunter Chase. Barry Construction no longer disputes the fact that it owns the property on which the new road was to be located. Thus, the legal question is whether Barry Construction, as a subsequent developer, must follow the conditions placed by the Council on the approval of the PUD district overlay. While the question appears to be one of first impression in this state, we think that to ask the question is practically to answer it.
First, the comprehensive zoning ordinance expressly required subsequent owners and developers to "complete" their part of the project. The comprehensive zoning ordinance required that all land to be included within a PUD be under common ownership at the time of approval. COMZO § 81.40 (1977) (repealed); cf. Metro Code § 17.36.040(B). After that, the original owner/developer was generally free to divide up the project and to transfer all or part of it to other parties. COMZO § 81.40 (repealed); cf. Metro Code § 17.40.120(D). However, each transferee was expressly required to "complete" its part of the development and to "use and maintain it in strict conformance with the adopted final master development plan." COMZO § 81.40 (repealed); cf. Metro Code §§ 17.36.040(B), 17.40.120(A)(6).
Second, our case law recognizes that a PUD district overlay is a type of "zoning," Burson & Simpson Lodge Devs., Inc. v. Metro. Gov't of Nashville & Davidson County, No. 01A01-9805-CH-00249, 1999 WL 114257, at *1, *3-4 (Tenn.Ct.App. Mar.5, 1999) (No Tenn. R.App. P. 11 application filed); Quinnan v. Scarlett, No. 89-420-II, 1990 WL 51812, at *1 (Tenn.Ct. App. Apr.27, 1990) (No Tenn. R.App. P. 11 application filed), and that the preliminary master plan that forms the basis for the approval of a PUD constitutes a set of legally enforceable development restrictions, Burson & Simpson Lodge Devs., Inc. v. Metro. Gov't of Nashville & Davidson County, 1999 WL 114257, at *3-4; Hovenden v. City of Gallatin, 1996 WL 99800, at *1, *4-5. Because they are the equivalent of zoning restrictions, we agree with the weight of authority from other jurisdictions that the conditions and requirements of the preliminary master plan are binding not only on the original developer, but also on subsequent developers and owners of property within the PUD. See, e.g., South Creek Assocs. v. Bixby & Assocs., Inc., 781 P.2d 1027, 1033 (Colo. 1989); Story Bed & Breakfast, LLP v. Brown County Area Plan Comm'n, 819 N.E.2d 55, 57, 64-65 (Ind.2004).[27] Accordingly, the Council's ordinance approving the PUD district overlay and incorporating the preliminary master plan provides a sufficient legal basis for requiring Barry Construction to complete the missing portion of Smith Springs Parkway.
Barry Construction contends that even if it did have an obligation to complete Smith Springs Parkway at some point, that obligation was extinguished by the Planning Commission's approval of the final subdivision plats for Phase I, section 2 and Phase I, section 3. Planning commission approval of a subdivision plat is a prerequisite for recordation in the county *852 register, the construction and dedication of roads, and the issuance of building permits. Tenn.Code Ann. §§ 13-3-402(a)(1), (c) (Supp.2006), 13-3-406 (1999), 13-3-411(a)(2) (1999), 13-4-302(a), (c)(1) (Supp. 2006), 13-4-307 (1999), 13-4-308(a)(1) (1999). Courts can order specific performance of conditions attached to the approval of a subdivision plat, Village of Los Ranchos de Albuquerque v. Shiveley, 110 N.M. 15, 791 P.2d 466, 470-71 (N.M.Ct.App. 1989), and if a developer fails to comply with the conditions of approval, the approval of the subdivision plat can be rescinded, State ex rel. Byram v. City of Brentwood, 833 S.W.2d 500, 505 (Tenn.Ct. App.1991); Foley v. Hamilton, 603 S.W.2d 151, 153 (Tenn.Ct.App.1980).[28] Thus, the power to approve or disapprove subdivision plats is one of the primary mechanisms by which planning commissions exercise their statutory authority to set local planning priorities.
However, generally speaking, neither planning commission approval of a subdivision plat nor its recording in the county register is sufficient to alter the zoning of the property or create an estoppel against the enforcement of zoning restrictions. Cohalan v. Schermerhorn, 77 Misc.2d 23, 351 N.Y.S.2d 505, 511 (N.Y.Sup.Ct.1973) ("[N]either the approval nor the filing of a non-conforming map can change the zoning or create an estoppel that will work such change."); see also Cristofaro v. Town of Burlington, 217 Conn. 103, 584 A.2d 1168, 1170 (1991) ("[T]he enabling statute for the planning commission . . . does not permit what amounts to de facto amendment of zoning ordinances."). Simply stated, the planning commission does not have the authority allow this modification of the PUD plan without the approval of Metro Council. In Evans v. Metro. Planning Comm'n of Nashville and Davidson County,[29] this Court determined that the planning commission could not independently permit a developer to modify a PUD plan to allow road access that had been prohibited under the ordinance in which the council approved of the PUD plan.[30] To the contrary, the council's concurrence was required. We reached this conclusion in Evans despite the planning commission's approval of the change, and the planning commission and developer's insistence that the change did not require the council's concurrence. This case presents strikingly similar circumstances and leads us to the same conclusion. As in Evans, we conclude that under the Metro Charter and Metro Code, this change, a specific deviation from the ordinance requirements, cannot be valid without the concurrence of Metro Council.[31] Accordingly, *853 without approval of the modification, the requirements of Metro Ordinance 88-491, notably the construction of Smith Springs Parkway, continue to apply, and the Metro Government is not estopped from enforcing these requirements. Furthermore, the mere approval or recording of a subdivision plat does not give a property owner a vested right to develop his or her property in contravention of the applicable zoning restrictions. The Tennessee Supreme Court has explained as follows:
[A] landowner is charged with knowledge of city ordinances. . . . We are of the opinion that complainant acted at its own peril in obtaining approval of, recording, and subsequently developing to the fullest extent possible, this subdivision, when, in fact, complainant knew that certain lots, including 37A, were in noncompliance with the zoning ordinances and that, accordingly, complainant could be denied a building permit or variance.
Union Trust Co. v. Williamson County Bd. of Zoning Appeals, 500 S.W.2d 608, 617 (Tenn.1973).[32] Accordingly, Barry Construction's omission of the middle portion of Smith Springs Parkway from the final subdivision plats approved by the Planning Commission did not absolve Barry Construction of its legal obligation to finish the road.

IV.
We vacate the trial court's orders dismissing the amended complaint against Barry Construction and granting summary judgment in favor of JCH and remand the case for consideration of the appropriate allocation of responsibility for the construction between the two developers. We tax the costs of this appeal, jointly and severally, to Barry Construction Co., Inc. and JCH Development Co., Inc. for which execution, if necessary, may issue.

ORDER DENYING PETITION FOR REHEARING
JCH Development Company, Inc. has filed a timely petition for rehearing regarding the portion of this court's February 21, 2007 opinion holding that the complaint filed by the Metropolitan Government in the case states a claim against it for the completion of Smith Springs Parkway. It asserts that it is no longer legally responsible for completing the road because it contracted this responsibility away to Barry Construction Company, Inc.
We see no need to revisit this question. JCH Development Company remains liable to the Metropolitan Government for the completion of the improvements it agreed to make in return for the rezoning and the approval of the PUD district overlay. Nothing in our February 21, 2007 opinion states that JCH Development *854 Company could not contract with a third party like Barry Construction Company to complete the improvements. However, when it does so, it remains ultimately liable to the Metropolitan Government for the completion of the improvements.
The question regarding the allocation of liability between JCH Development Company and Barry Construction Company was not directly before the trial court because both developers were insisting that they had no obligation to complete the road. Now that we have determined that the Metropolitan Government has stated a claim against both JCH Development Company and Barry Construction Company for the completion of the road, the allocation of liability between them will be a matter for the trial court to take up following remand.
NOTES
[1] The Metropolitan Council (Council) is the chief legislative body for the Metropolitan Government of Nashville and Davidson County, Tennessee (Metro). Charter of the Metropolitan Government of Nashville and Davidson County, Tenn. §§ 1.06, 3.01 (2006) (Metro Charter). Generally speaking, the Council has the final say over all issues related to zoning. Family Golf of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County, 964 S.W.2d 254, 258 (Tenn.Ct.App.1997).
[2] The scope of JCH's planned development required the property to be rezoned from an AR2a (agricultural-residential district) to a R15 (low-medium-density) residential district. Code of the Metropolitan Government of Nashville and Davidson County, Tenn. app. A §§ 11.12(a) (1987) (repealed), 21.11 (1987) (repealed), 21.13 (1987) (repealed) (COMZO); cf. Code of the Metropolitan Government of Nashville and Davidson County, Tenn. §§ 17.08.010; 17.08.020(A), (B)(2)(c) (2006) (Metro Code). Metro's comprehensive zoning ordinance, commonly known as "COMZO," was still in effect when JCH conceived this project in 1988. It has since been repealed and replaced by later enactments. For the reader's convenience, we have provided parallel citations to the current zoning code when citing the prior ordinance.
[3] The Metropolitan Planning Commission (Planning Commission) is Metro's official planning agency. Metro Charter § 11.501 (2006). It possesses all powers granted by state law to regional, municipal, and metropolitan planning commissions. Metro Charter § 11.504 (2006).
[4] A PUD district overlay is a common zoning technique that affords developers greater flexibility in the design and placement of elements of large-scale projects while generally satisfying the density, bulk, and other restrictions of the underlying zoning district or districts when the entire project is considered as a whole. 8 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 25.92.20, at 300-01 (3rd ed., rev.vol.2000) (MUNICIPAL CORPORATIONS); 3 JOHN MARTINEZ, LOCAL GOVERNMENT LAW § 16.17, at 16-38 to 16-39 (1997) (LOCAL GOVERNMENT LAW); see, e.g., COMZO §§ 81.00 (1984) (repealed), 82.00 (1987) (repealed), 82.30 (1987) (repealed), 83.00 (1985) (repealed), 83.40 to 83.44 (1985) (repealed); cf. Metro Code §§ 17.36.010 (2006), 17.36.030 (2006), 17.36.040(C)(3)-(4), (D) (2006), 17.36.060(A)-(G) (2000).
[5] The phrase "master development plan" has different meanings under the comprehensive zoning ordinance and the current zoning code. When this project was initiated in 1988, Metro's comprehensive zoning ordinance contemplated two types of master development plans: the "preliminary" master development plan, and the "final" master development plan. COMZO §§ 12.10 (1984) (repealed), 81.20 (1987) (repealed), 81.22 (1987) (repealed), 81.23 (1982) (repealed), 85.27 (1976) (repealed), 85.271 (1987) (repealed), 85.273 (1987) (repealed), 85.275 (1987) (repealed). However, under Metro's current zoning code, there is only one "master development plan." Metro Code §§ 17.04.060(B) (2006), 17.40.120(A)(1) (2006). There is also a "final site plan." Metro Code §§ 17.04.060(B), 17.40.170(B)(1), (3) (2006). In essence, Metro's current zoning code uses the terms "master development plan" and "final site plan" in place of the comprehensive zoning ordinance's "preliminary master development plan" and "final master development plan," respectively.
[6] JCH eschewed the terminology of the comprehensive zoning ordinance in its original submittal to the Planning Commission and the Council, labeling its preliminary master plan a "Preliminary P.U.D. Submittal."
[7] See Metro Charter § 18.02 (2006) ("Any revision, modification or change in the zoning regulations of the metropolitan government . . . shall be made only by ordinance."); see also COMZO § 85.26 (1976) (requiring amendment of zoning code for approval of preliminary master plan) (repealed) § 104.13; cf. Metro Code §§ 17.40.050 (2006), 17.40.060(A) (2006), 17.40.110 (2006), 17.40.120(A)(5).
[8] COMZO § 85.276 (1987) (repealed); cf. Metro Code §§ 17.40.030 (2006), 17.40.090 (2006), 17.40.110.
[9] See COMZO §§ 81.32 (1977) (authorizing Planning Commission to allow development of a PUD in stages) (repealed), 81.33 (1977) (repealed), 85.22(f) (1988) (repealed), 85.272 (1987) (repealed); cf. Metro Code §§ 17.36.060(I), 17.40.120(C).
[10] As with its preliminary master plan, JCH eschewed the terminology of the zoning code, labeling its final master plan a "Final P.U.D. Submittal."
[11] COMZO §§ 12.10 (repealed), 81.22 (repealed), 81.23 (repealed); cf. Metro Code §§ 17.40.120(B), 17.40.170(B).
[12] The word "plat" is a term of art in the planning profession that generally refers to a subdivision map prepared for approval by a governmental authority. Richards v. Abbottsford Homeowners Ass'n, 809 S.W.2d 193, 196 (Tenn.Ct.App.1990); Sellon v. City of Manitou Springs, 745 P.2d 229, 233-34 (Colo.1987). It connotes the map depicting the manner in which property has been subdivided. Richards v. Abbottsford Homeowners Ass'n, 809 S.W.2d at 196; McKain v. Toledo City Plan Comm'n, 26 Ohio App.2d 171, 270 N.E.2d 370, 373 (1971). The term has a similar meaning in Tennessee's statutes governing regional and municipal planning. Tenn.Code Ann. §§ 13-3-401(1) (1999), 13-4-301(2) (1999).
[13] By this point, Metro had repealed the comprehensive zoning ordinance and replaced it with a new zoning code. However, in a subsection titled "Status of Earlier Planned Unit Developments (PUDs)," the new zoning code expressly stated that PUDs approved under the repealed comprehensive zoning ordinance "shall be recognized . . . according to the master development plan and its associated conditions specified in the PUD ordinance last approved by the metropolitan council." Metro Code § 17.40.120(G)(1). Thus, the preliminary master plan approved by the Council and incorporated into the PUD ordinance continued to provide the legal basis for the development of the project.
[14] See Tenn.Code Ann. §§ 13-3-403(b) (1999) (authorizing regional planning commissions to accept performance bonds in lieu of actual completion of work and installations required as a precondition for approval of a final subdivision plat), 13-4-303(b) (1999) (authorizing municipal planning commissions to do the same).
[15] See 1330 Conn. Ave., Inc. v. D.C. Zoning Comm'n, 669 A.2d 708, 716 n. 11 (D.C.1995) (noting that decisions regarding the approval of "land use within a PUD will be made considering the entire PUD, not just a particular parcel within a PUD"); Estate of Friedman v. Pierce County, 112 Wash.2d 68, 768 P.2d 462, 469 (1989) ("[O]ne acquiring land within a PUD must be aware that the land is subject to controls consistent with the entire PUD. Thus, not only the original developer, but anyone acquiring land within the PUD at a later time should not expect that land use decisions will be made considering only a particular parcel within the PUD."); see also River Birch Assocs. v. City of Raleigh, 326 N.C. 100, 388 S.E.2d 538, 549 (1990).
[16] JCH filed its answer denying responsibility for the completion of Smith Springs Parkway on March 24, 2005.
[17] Tenn. R. Civ. P. 12.02(6); see also City of Brentwood v. Metro. Bd. of Zoning Appeals, 149 S.W.3d 49, 53-54 (Tenn.Ct.App.2004); Smith v. First Union Nat'l Bank of Tenn., 958 S.W.2d 113, 114-15 (Tenn.Ct.App.1997).
[18] Tenn. R. Civ. P. 56.04; see also Byrd v. Hall, 847 S.W.2d 208, 214-15 n. 5 (Tenn. 1993); Cherry v. Williams, 36 S.W.3d 78, 82-83 (Tenn.Ct.App.2000).
[19] See Hughes v. LaSalle Bank, N.A., No. 02 Civ. 6384(MBM), 2006 WL 1982983, at *6 (S.D.N.Y. July 14, 2006) ("Plaintiffs have the responsibility to plead their case adequately, without defendants' or the court's assistance."); In re Alamosa Holdings, Inc. Sec. Litig., 382 F.Supp.2d 832, 843 n. 5 (N.D.Tex. 2005) ("The burden will rest on the Plaintiffs to sufficiently plead their case. . . ."); Melfi v. City of Danbury, 70 Conn.App. 679, 800 A.2d 582, 589 (2002).
[20] Although the amended complaint could have been clearer on this point, Metro narrowly satisfied the requirements of Tenn. R. Civ. P. 8.05(1) by clearly identifying the ordinance on which it was relying, stating its substance in a separate paragraph of the amended complaint, and recounting the manner in which Barry Construction and JCH had allegedly violated it.
[21] Given our holding that the trial court erred in concluding that the amended complaint failed to recite a valid legal basis for recovery against the developers, we need not address Metro's arguments that the trial court also erred by denying its motion to revise the order dismissing the amended complaint and by denying its motion for permission to file a second amended complaint. Moreover, in light of our conclusion that the Council ordinance approving the project provides a legal basis for requiring both developers to construct the missing portion of Smith Springs Parkway, we need not address Metro's claim that the zoning code sections cited in the amended complaint and the subdivision regulations promulgated by the Planning Commission provide independent bases for requiring the developers to finish the road.
[22] See COMZO § 81.52 (1989) (authorizing Council and Planning Commission to require that "suitable areas for streets [and] public rights-of-way . . . be set aside, improved, and/or dedicated for public use" as a condition of approval for a PUD district overlay) (repealed); cf. Metro Code § 17.36.050(B) (2006) ("Approval of a PUD shall be based upon a finding that streets, utilities and drainage features will be of adequate capacity to serve the proposed development. As part of a master development plan proposal, a property owner may offer to upgrade or otherwise provide adequate facilities to support the proposed intensity of development."); see generally 8 MUNICIPAL CORPORATIONS § 25.92.20, at 303 ("Conditions precedent to the approval of a planned unit development, such as contributing to road improvements or dedication of land, may be imposed where the conditions are within the delegations of authority.").
[23] As one commentator recently explained:

The failure of the typical . . . zoning district classification scheme to address a myriad of development and development control issues led in the late 1950's to a search for more precise as well as more flexible techniques to control the use of land. One of the most popular of those techniques is planned, or planned unit, developmentPD or PUD. The basics of the technique are contained in the name: the very precise planning of a development, usually in whole or in part residential, as a "unit" on one parcel of land. An appropriate local governmental agency is presented by a landowner with a land use development plan somewhat at variance with existing zoning. In exchange for approval, the local government exercises more precise control than would otherwise be theoretically possible when acting upon a request for a map or text amendment.
3 LOCAL GOVERNMENT LAW § 16.17, at 16-38; see also 8 MUNICIPAL CORPORATIONS § 25.92.20, at 302.
[24] See also Tri-State Generation & Transmission Co. v. City of Thornton, 647 P.2d 670, 681 (Colo.1982); Frankland v. City of Lake Oswego, 267 Or. 452, 517 P.2d 1042, 1048-49, 1052 (1973); 8 MUNICIPAL CORPORATIONS § 25.92.20, at 302.
[25] Later events only reinforced JCH's original obligation. In 1989, the Planning Commission approved JCH's final master plan for Phase I of the project. The final master plan included maps and drawings depicting the construction of all of Smith Springs Parkway as part of Phase I. As with the preliminary master plan, the comprehensive zoning ordinance imposed on JCH an express legal duty to construct the infrastructure elements reflected in the final master plan approved by the Planning Commission. COMZO § 82.64 (1984) ("All residential planned unit developments shall be provided with street improvements, sidewalks, and any other facility required by the final master plan of development in accordance with the standards established by that plan.") (repealed).
[26] JCH also relies on the Planning Commission's approval of the final subdivision plats for Phase I, section 2 and Phase I, section 3. As explained below, we find no merit in this argument as it applies to Barry Construction. It has no greater force when applied to JCH.
[27] See also Millbrae Ass'n for Residential Survival v. City of Millbrae, 262 Cal.App.2d 222, 69 Cal.Rptr. 251, 266-68 (1968); Palm Beach Polo, Inc. v. Village of Wellington, 918 So.2d 988, 992-93 (Fla.Dist.Ct.App.2006); Holwerda Builders, LLC v. Twp. of Grattan, No. 260711, 2005 WL 1652294, at *5 (Mich.Ct.App. July 14, 2005); Estate of Friedman v. Pierce County, 768 P.2d at 463, 469.
[28] Accord Parker v. Bd. of County Comm'rs, 93 N.M. 641, 603 P.2d 1098, 1101 (1979); Gallup Westside Dev., LLC v. City of Gallup, 135 N.M. 30, 84 P.3d 78, 82 (Ct.App.2003); HJS Dev., Inc. v. Pierce County ex rel. Dep't of Planning & Land Servs., 148 Wash.2d 451, 61 P.3d 1141, 1149-50, 1154 (2003).
[29] Evans v. Metro. Planning Comm'n of Nashville and Davidson County, No. 01A01-9303-CH-00115, 1993 WL 350132, *1-2 (Tenn.Ct. App. Sept.15, 1993) (No Tenn. R.App. P. 11 application filed)
[30] The original plat in Evans, which was approved by the Metro Planning Commission and Metro Council, conspicuously noted that there would be no access to Fairway drive from the PUD. The original plan was incorporated into the ordinance passed by the Metro Council, which gave the Council's preliminary approval of the PUD. Evans v. Metro. Planning Comm'n of Nashville and Davidson County, 1993 WL 350132, at *1.
[31] Metro Charter § 18.02 ("Any revision, modification or change in the zoning regulations of the metropolitan government as provided in this section shall be made only by ordinance."); COMZO § 85.26 (1976) (repealed); 85.32 (1988) (repealed); 85.33 (1988)(repealed); Metro Code § 17.140.120(F)(1)(b)(2006) ("[m]odification of special performance criteria, design standards, or other requirements specified by the enacting ordinance shall be authorized by council ordinance"); see also Evans v. Metro. Planning Comm'n of Nashville and Davidson County, 1993 WL 350132, at *1 (When a PUD has been approved by both the Commission and the Metro Council, the Commission may approve minor changes. "However, if substantive amendments impacting such items as the PUD's boundaries, access, bulk, density, or activity types are requested, the PUD must be referred to the Metropolitan Council after commission action.")
[32] Cf. Custom Land Dev., Inc. v. Town of Coopertown, 168 S.W.3d 764, 776 (Tenn.Ct. App.2004) (holding that "the mere granting of site plan approval [by the local planning commission] and issuance of a business license by the County does not grant a vested property right" to develop land in violation of local zoning ordinances).