**Darrell ARTHUR et al.,**
**Plaintiffs-Petitioners,**

v.

**LAKE TANSI VILLAGE, INC.,**
**Defendant-Respondent.**

Supreme Court of Tennessee.

Dec. 10, 1979.

Charles G. Taylor, III, Knoxville, for plaintiffs-petitioners; Ayres, Parkey, Skaggs & Ware, Knoxville, of counsel.

Thomas E. Looney, Marsha L. K. Seleeman, Crossville, for defendant-respondent; Looney, Looney & Conner, Crossville, of counsel.

## OPINION

BROOKS McLEMORE, Special Justice.

This case involves the question of whether there exist *implied* restrictive covenants running with the land which prohibit the defendant-respondent, hereinafter called the defendant, from removing or relocating certain recreational facilities, namely; (1) a marina which is to be relocated from the north shore of Lake Tansi, to the south shore, which would place a modern marina equipped to moor and service some 80 boats along a dam in close proximity to plaintiffs' property; (2) a sand beach which has been destroyed, but which according to the defendant's president, will be re-established near its original location; (3) a golf course, 13 holes of which are to be relocated; some of these are lakeside holes which are to be moved away from the lake; and, (4) an airstrip which was closed because of the inability of the defendant to meet FAA regulations in regard to its operation, as well as the defendant's failure to obtain air rights so takeoff and landings could be accomplished in both directions. The space made available by the relocation of 13 holes of the golf course and the abandonment of the air strip is to be subdivided and sold for homesites. The sand beach space is to be reserved for future development. There are no stated plans for the present marina site.

The trial court and the Court of Appeals both found in favor of the defendant.

Darrell Arthur, Jack Hickey, Charles Taylor, Sam Hamric and their wives, plaintiffs-petitioners, hereinafter called plaintiffs, petitioned this court and certiorari was granted to review that action. The suit was brought individually and not in a representative capacity.

We affirm the judgment of the Court of Appeals.

During a portion of the year 1963, and prior thereto, Cosby Harrison and wife operated considerable acreage including the Lake, then named Lake Harrison, in the business of renting property for transient guests. Harrison operated the property as a resort area and did not sell any homesite property as he was not interested in that type of development.

By deeds dated March 1, 1963, and September 2, 1963, Cumberland Plateau Resorts, Inc., a Tennessee corporation, the common grantor of all property which is the subject matter of this lawsuit, acquired approximately 2,660 acres of improved and

unimproved property from Cosby Harrison and wife; this included among other things, Lake Harrison, a nine-hole golf course which was located partially along the shore of the lake, a marina, an airstrip and a sand beach.

Cumberland Plateau Resorts, Inc., whose main object was the sale of primary and secondary homesites, changed the name of the lake to Lake Tansi, platted a relatively small portion of the property and placed of record in the Cumberland County Register's Office various subdivision plats depicting certain portions of the property adjacent to and surrounding the lake. These subdivision plats depicted some of the various lots then for sale, parts of the original nine-hole golf course, the airstrip, the marina, and the general area for the proposed second nine holes of golf. The number of lots for sale in 1963 consisted of approximately 686 of which 133 were lake front lots some of which were accessible only by boat. The property owned by plaintiffs is from this group of lots. Copies of these plats were in the sales office at Lake Tansi; however, none of plaintiffs' lots are shown on plats that show the recreation facilities mentioned.

Certain brochures describing and showing pictures of the recreational facilities at Lake Tansi were available in the sales office and were used in sales.

The plaintiffs acquired their respective homesites either directly or by succession of title from Cumberland during a period beginning on May 20, 1963, and ending March 30, 1968. From the deeds filed in the stipulation, it appears that all of the lots owned by plaintiffs except three, were conveyed by Cumberland either to the plaintiffs or others in their chain of title by August 22, 1963; the three lots were conveyed by Cumberland to Taylor by deed dated August 16, 1966. Though all the deeds are not in the record, it appears Arthur owns one and one-half lots, Hamrick owns two which adjoin, Hickey owns one and Taylor owns five in a block. All of plaintiffs' lots are in the same general area and all are lake-front lots. *None of these lots adjoin, touch or are close to, the marina, the airstrip, the sand beach or the golf course.*

Plaintiffs' deeds did not mention any of these facilities; however, they were permitted to use these facilities for an annual fee. Apparently, the general public could use all the facilities upon payment of appropriate charges. Later, Cumberland added the additional nine holes to the golf course; some of these holes were placed along the lake shore.

All the deeds filed in the stipulation concerning property purchased by the plaintiffs, except two, describe the property by lot number "as shown by plat no. 3 of Tansi Resort Sub-division, which plat is duly recorded in Plat Book No. 1, Page 169, Register's Office, Cumberland County, Tennessee." As to the two exceptions, one deed also refers to a revised plat found at Plat Book 1, Page 176 and a second deed refers to Plat Book 1, Page 194. All of the deeds recite that "this conveyance is made subject to restrictive covenants, limitations and conditions contained in the restrictive covenants in the Tansi Resort Sub-division, dated the 5th day of April, 1963, of record in Deed Book No. D–62, Page 30, Register's Office, Cumberland County, Tennessee." The recorded restrictions above mentioned are not a part of the record, although there are certain property reports made by the defendant pursuant to federal statute which do show restrictions as to Southlake 3, that portion of Lake Tansi Resort embracing plaintiffs' lots. The first restriction recites, "the lots shall be used exclusively for residential purposes except those lots designated as business or commercial areas."

In 1968, Lake Tansi Village, Inc., was incorporated in Tennessee; it then purchased on May 14, 1968, all of the Lake Tansi property from Cumberland except those lots sold to third persons like the plaintiffs and their predecessors. Thereafter, in December of 1971, new management assumed control when all the stock of Lake Tansi Village, Inc. was purchased by National American Corporation. By virtue of this stock purchase and a subsequent merg-

er with an Alabama corporation, which was also a subsidiary of National American, the defendant became an Alabama corporation licensed to do business in Tennessee. Lake Tansi Village, Inc., is a wholly owned subsidiary of National American Corporation. An additional 1780 acres of land were acquired from third parties. Shortly thereafter, a land planner was hired and an overall plat was developed by the planner; this plat reflected, among other things, the planner's recommendation to relocate part of the existing 18 holes of golf and to eliminate the landing strip. The overall plat consists of 3,327.45 acres, subdivided into 9,655 residential lots and in addition, several hundred acres of recreational facilities. The overall plat is not recorded as one, but was recorded as approximately 50 smaller plats. The large plat was reduced to printing press size and distributed by the tens of thousands in 1974. An enlargement of the overall plat was, and still is, displayed in the Sale Office.

Beginning in 1972, the defendant filed several property reports under the Interstate Land Sales Full Disclosures Act. The report dated April 30, 1972, lists recreational facilities that were available at that time. This list included the 18-hole golf course, however, the landing strip was not listed as being available for use, nor was the sand beach or marina included among the facilities listed. This report contained the statement, "All presently contemplated facilities are complete." A second property report, effective on May 29, 1973, lists the same facilities as in the 1972 report and similarly does not mention a landing strip, sand beach and marina. This property report adds the following statements: "At present, there is a grass runway for small planes. Because of its infrequent use, seller plans to abandon such runway at a future date and add such land to its residential development . . . Sellers reserve the right to relocate certain holes of the golf course, however, such relocation will not take place until replacement holes have been constructed and ready for play." A report of July 10, 1973, listed the same facilities as did the second report and con-

tained the above-quoted statements. The most recent property report, dated December 28, 1976, contains an expanded list of facilities available and proposed. It reports the plan to close the airstrip and it also contains a disclosure regarding the right to relocate various holes of the golf course, as well as the pro shop, and to develop the property where they exist. An assurance is given that an 18-hole golf course and pro shop will always be available for property owners. "Lake Tansi and boat marina" are listed; the sand beach is not.

On November 21, 1973, the defendant inserted an advertisement in a local newspaper describing certain of the facilities. The airstrip is not mentioned. This advertisement contained the following:

FOREVER IS A LONG TIME. . . .
But that's how long you & your family will be able to enjoy the facilities of Lake Tansi Village.

In the early part of 1977, the plaintiffs became aware of the defendant's intention to relocate certain holes of the golf course away from the lake and to abandon the present marina and build a new marina in close proximity to their lots. This suit for injunction, or in the alternative, damages, resulted. Plaintiffs have filed three assignments of error. They assign as error, first, that the evidence preponderates in favor of their insistence of implied covenants and second, that the defendant is estopped from denying the existence of such covenants. By their third assignment of error, plaintiffs insist that the Court of Appeals erred in holding that plaintiffs could not rely upon plats not referred to in their deeds to establish the existence of implied restrictive covenants.

Parenthetically, we note that it would be difficult to read this record without perceiving that the real concern of the plaintiffs is the relocation of the marina near their lots with all the attendant noise, wakes, pollution and impediment of their view of the lake.

In beginning our consideration of the assignments of error, we quote with approval

from the Court of Appeals' opinion prepared by Judge Goddard:

As a preliminary to addressing the assignments of error, we observe that although our courts recognize the validity of restrictive covenants they are not favored. This Court in a recent case, *Waller v. Thomas*, 545 S.W.2d 745, at page 747 (Tenn.App.1976), said:

Our courts have long recognized several established rules of construction regarding restrictive covenants, which can be stated as follows: Although the law recognizes the validity of restrictive covenants, they are not favored because such covenants are in derogation of the unrestricted enjoyment of the fee. Therefore, restrictive covenants are to be strictly construed and will not be extended by implication and any ambiguity in the restriction will be resolved against the restriction. See *Emory v. Sweat*, 9 Tenn.App. 167 (1927); *Carr v. Trivett*, 24 Tenn.App. 308, 143 S.W.2d 900 (1940); *Lowe v. Wilson*, 194 Tenn. 267, 250 S.W.2d 366 (1952); *Hamilton v. Broyles*, 57 Tenn. App. 116, 415 S.W.2d 352 (1966).

With this background we turn to the assignments of error and conclude that insofar as implied covenants are concerned the plaintiff may prevail only on a showing of one of the following: (1) implication by necessity, (2) implication by conveying property with restrictions under a general plan or scheme of development, (3) implication by reference to a plat.

As to the first, the plaintiffs rely upon a case decided by the Supreme Court of Texas, *Danciger Oil & Refining Company of Texas v. Powell*, 154 S.W.2d 632 (1941), which incidentally, did not find a restrictive covenant by implication. There the Court said (at page 635):

In the outset it should be noted that when parties reduce their agreements to writing, the written instrument is presumed to embody their entire contract, and the court should not read into the instrument additional provisions unless this be necessary in order to effectuate the intention of the parties as disclosed by the contract as a whole. An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument. It is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a covenant it would be improvident or unwise, or that the contract would operate unjustly. It must arise from the presumed intention of the parties as gathered from the instrument as a whole. 21 C.J.S., Covenants, § 9, p. 888; 13 C.J. 558; 17 C.J.S., Contracts § 328; 15 C.J. 1214; 21 C.J.S., Covenants, § 14; 14 Amer. Jur. 490; *Freeport Sulphur Co. v. American Sulphur Royalty Co.*, 117 Tex. 439, 6 S.W.2d 1039, 60 A.L.R. 890; *Grass v. Big Creek Development Co.*, 75 W.Va. 719, 84 S.E. 750, L.R.A.1915E, 1057. However, covenants will be implied in fact when necessary to give effect to the actual intention of the parties as reflected by the contract or conveyance as construed in its entirety in the light of the circumstances under which it was made and the purposes sought to be accomplished thereby. See Property Interest Created by Lease, by A. W. Walker, Jr., Professor of Law, University of Texas, 11 Texas Law Review 402.

Upon viewing the conveyances we cannot say that the restrictions insisted upon by the plaintiffs were so clearly within the contemplation of the parties that they deemed it unnecessary to express them. Consequently, the plaintiffs may not prevail under this theory.

■ We believe that the foregoing rationale and statement of the law succinctly and adequately deals with the theory of implication by necessity as it applies to the instant case.

In assignment two, plaintiffs focus their argument upon the implication of restrictive covenants stemming from the defendant's development of this property along the lines of a general plan or scheme. Ways of establishing such a plan or scheme are discussed at 20 Am.Jur.2d, *Covenants* § 175 (1965):

"One of the most common forms of imposing building restrictions is by the establishment of a general building plan of improvement or development covering a tract divided into a number of lots. Such a plan may be established in various ways, such as by express covenant, by implication from a filed map, or by parol representations made in sales brochures, maps, advertising, and oral statements on which the purchaser relied in making his purchase. It is said that the most complete way is by a reciprocal covenant whereby the grantor covenants to insert like covenants in all deeds out of the common development, and that other ways may consist of the grantor's selling the lots upon representations to the individual purchasers that like covenants will be inserted in the grantor's deeds to others, for the common benefit, or the grantor's pursuing a course of conduct indicating a neighborhood scheme, leading the several purchasers to assume its adoption and the adherence to it by such conduct.

As heretofore shown, where such a plan is created, the conveyance of a lot or lots therein raises an implied covenant restricting the remaining lots. . . ."

See also 7 Thompson, *Real Property* § 3159 (1962).

The doctrine of reciprocal negative easements was recognized and applied by this court in *Land Developers, Inc. v. Maxwell*, 537 S.W.2d 904 (Tenn.1976). This doctrine involves the general plan or scheme of development theory. There, the restrictions all involved limiting the property previously conveyed to residential development.

The Court explains the manner in which negative reciprocal easements, a form of restrictive covenants, are to be applied. Justice Harbison speaking for the court said:

". . . the doctrine of negative reciprocal easements, while well recognized in the law of property, is to be applied with great care. Thus the Court of Appeals of Kentucky, while recognizing the doctrine, stated:

'We think it quite apparent that the doctrine ought to be used and applied with extreme caution, for it involves difficulty and lodges discretionary power in a court of equity, in a degree, to deprive a man of his property by imposing a servitude through implication.' *McCurdy v. Standard Realty Corp.*, 295 Ky. 587, 175 S.W.2d 28, 30 (1943).'"

■ If restrictive covenants enforceable by the plaintiffs prohibiting the abandonment of the air strip and the relocation of the marina, the sand beach and a portion of the golf course arising from a general plan of development do exist; these arose at the time the plaintiffs or their predecessors in title purchased their property. The Chancellor, rather than finding a plan in existence at the time plaintiffs purchased, found, "that the defendant, for the past several years has put into effect an overall development plan, which includes the alteration or relocation of certain golf holes, a sand beach, and a boat marina, together with the abandonment of a grass landing strip for small aircraft." The Court of Appeals found specifically that there was no general plan of development in the early stages when plaintiffs or their predecessors purchased. The statement of the Court of Appeals in part is, ". . . in the early stages the development was like Topsy and no real general plan emerged until after the merger was accomplished and a real estate consultant employed." We agree with this finding and therefore, plaintiffs can obtain no relief under this theory.

To aid in the disposition of plaintiffs' third assignment of error with respect to

implication by reference to a plat, we quote with approval from the opinion of the Court of Appeals:

"As to the last point, plaintiffs insist that because certain recorded plats show the facilities, they have acquired a property right in them under the authority of *Moore v. Queener,* 62 Tenn.App. 490, 464 S.W.2d 296 (1970). The problem with this theory, however, is that the plats to which the plaintiffs' deeds refer are not a part of the record. Moreover, we gather from plaintiffs' briefs that the facilities are not shown upon these plats because counsel argues that the defendant should be bound by other plats which actually show the facilities. Plaintiffs maintain that this was necessary because the development is so large that it was impractical, if not impossible, to show all the various subdivisions comprising the resort on a plat the size of which is suitable for recording. We concede that this may be true. However, the rationale behind implying a property right in cases like *Moore* is because the plat is incorporated by reference in the deed of conveyance. Obviously a plat to which no reference is made cannot be incorporated in a deed."

Plaintiffs' third assignment of error in this court takes issue with the foregoing reasoning and holding of the Court of Appeals. Plaintiffs complain that the Court of Appeals has, in effect, held that the plaintiffs may not rely upon recorded plats showing the golf course, marina and air strip because plaintiffs' lots do not appear on the same plats. We find no merit to this assignment. As earlier stated, plaintiffs' lots do not appear on the plat with the recreational facilities mentioned and plaintiffs' deeds *do not refer* either to the facilities or the plats of record that show these facilities. The opposite is true in the case of *McCleary et al. v. Lourie,* 80 N.H. 389, 117 A. 730 (1922) upon which the plaintiffs heavily rely.

■ We interpret the holding of the Court of Appeals on this point to be that a plat may be utilized in establishing implied restrictive covenants if the deed of the party seeking to impose the restriction refers to the plat. This holding is in accord with established legal principles. See, *e. g.*, 25 Am.Jur.2d, *Easements and Licenses* § 26 (1966) where it is said:

Generally, where property sold is described in the conveyance with reference to a plat or map on which streets, alleys, parks, and other open areas are shown, an easement therein is created in favor of the grantee. . . . But such an easement does not arise unless the conveyance refers to the map or plat which indicated the way, park, or other area in which an easement is claimed; *this requirement is not obviated by the fact that the way is shown on a recorded plat.* [Emphasis supplied.]

In *Moore v. Queener, supra*, plaintiffs' deed specifically referred to a plat upon which the easement he claimed appeared.

We find no merit to this assignment of error.

We turn now to plaintiffs' contention that the defendant is estopped from denying the existence of restrictive covenants.

■ Plaintiffs Arthur, Taylor and Hambric all testified that they saw the maps which depicted the golf course and the marina in the Sales Office prior to their purchase; however, the testimony as to plaintiffs' reliance on these maps and brochures is confusing. Hickey did not testify. There is no solid evidence of actual promises of permanency being made to plaintiffs by the original grantor or his agents. Plaintiffs contend that defendant's actions in distributing brochures, advertising in the newspaper, and making statements in its property reports all would estop the defendant, if not initially when plaintiffs purchased, then subsequently because of the improvements and maintenance of their property after such acts occurred. As to this contention, we point out as did the Court of Appeals, that the plaintiffs purchased their property long before the defendant ever assumed control of the resort and before it distributed brochures, advertised in the local newspaper, or filed its

property reports, and there is no satisfactory proof that the improvements or continued maintenance were done in reliance upon any acts or statements of the defendant. Therefore, an essential element of estoppel, action by one party in reliance upon misstatement by another to his detriment, is not present.

Estoppel *in pais* has been defined in this state as:

"Estoppel in pais is an estoppel that does not arise from a record or written instrument, but arises from the conduct or silence of a party and is sometimes referred to as equitable estoppel. In the true sense, all matters of estoppel arise in equity, for the purpose of the existence of the doctrine is to prevent inconsistency and fraud resulting in an injustice. When a man has been misled by the untruth propounded by another, *and acted to his detriment in reliance upon the misrepresentation*, the misleading party will be estopped to show that the true facts are contrary to those he first propounded." *Duke v. Hopper*, 486 S.W.2d 744, 748 (Tenn.App.1972). [Emphasis supplied.]

Even if implied restrictive covenants arose at the time of purchase, the restrictions cannot be imposed against the defendant, a purchaser for value, unless the evidence establishes that the defendant had notice of the restrictions. This general rule set forth in 28 Am.Jur.2d, *Estoppel and Waiver*, 117, page 776, is as follows:

As a general rule, an estoppel of a grantor runs against his grantee. Obviously, estoppels affecting grantees often involve the running and binding effect of covenants . . . It has been held that where an estoppel works on an interest in land, it becomes a muniment of the title, and when the owner conveys it he necessarily does so subject to the estoppel in the hands of his grantee. Clearly, a grantee is in privity with his grantor to the extent that he is bound by an estoppel in pais against the grantor if he had notice of the facts from which the estoppel arose at the time of the grant, but,

according to the prevailing rule, a bona fide purchaser for value and without notice of an estoppel against his grantor is not bound by the estoppel . . .

In *Maxwell, supra*, this court, at page 913, said:

"Of course, it is well settled, in Tennessee as elsewhere, that an owner of land is not bound by covenants restricting the use of the land by his remote grantor, when such covenants do not appear in the owner's chain of title and when he had no actual notice of the alleged covenant at the time he acquired title. See *Yates v. Chandler*, 162 Tenn. 388, 38 S.W.2d 70 (1931) . . ."

Plaintiffs contend that because the facilities were present on the ground and in use, and because of brochures used by former owners, and because of the recorded plats previously mentioned, the defendant had notice of restrictive covenants.

When the history of this development is considered, knowledge by the defendant that there was in existence in 1972 a golf course, a marina, a sand beach and a landing strip, none of which adjoined or were close to plaintiffs' lots, would not put the defendant on notice that there were any agreements between the original grantor and the plaintiffs prohibiting the relocation of the facilities nor the abandonment of the landing strip. The fact that a purchaser may know about certain characteristics of the land purchased will not necessarily impute knowledge as to any implied restrictions. In *Maxwell, supra*, it was found that the original grantor intended for all "Mimosa Heights" property to be residential and therefore, remaining property that had passed into the hands of others who were not purchasers for value was burdened by reciprocal negative easements, *i. e.*, they stood in the same position as would the original grantor. However, it was held that in the hands of a purchaser for value, a portion of the same remaining property would not be subject to the restrictions though the purchaser knew of the recorded restrictions as to property previously sold. The court found that such knowledge was a

far cry from charging him with knowledge of unrecorded, oral, or implied easements or restrictions covering unsold acreage.

The record is devoid of any proof of actual knowledge of defendant of any implied restrictive covenants running with plaintiffs' lots when the defendant purchased the development. On the other hand, there is convincing evidence in the record that management as far back as the purchase by Cumberland Plateau Resorts, Inc., did consider, and "there was talk of," moving some of the holes on the golf course, moving the marina and abandoning the airstrip, and that management never knew of or considered that there was any prohibition, express or implied, against altering or relocating the facilities. We conclude that the defendant had no notice of implied restrictive covenants and is not estopped as far as plaintiffs are concerned.

For the foregoing reasons, all assignments of error are overruled and the judgment of the Court of Appeals is affirmed. Costs are taxed against plaintiffs, and sureties.

BROCK, C. J., and COOPER, HENRY and HARBISON, JJ., concur.