IN THE SUPREME COURT OF TENNESSEE
November 4, 2020 Session[1]

# RITCHIE PHILLIPS ET AL. v. MARK HATFIELD

**Appeal by Permission from the Court of Appeals
Chancery Court for Sullivan County
No. 17-CB-25948(C)        E. G. Moody, Chancellor**

———————————————————

**No. E2019-00628-SC-R11-CV**

———————————————————

The issue in this case is whether restrictive covenants executed and recorded by the developers of a subdivision after they had sold the parties' lots apply to the Defendant's property. The developers platted a subdivision and sold the vast majority of lots with time-limited restrictions against non-residential use expressly stated in the deeds that conveyed the lots. Thereafter, the developers recorded a declaration of more fulsome, non-time-limited restrictive covenants—including a restriction against non-residential use—that purported to apply to all lots in the subdivision. Decades later, well after the expiration of the time-limited deed restrictions, the Defendant purchased lots and proposed to build a structure for the operation of a retail business. The Plaintiffs, who reside in a home on lots adjacent to the Defendant's property, brought a declaratory judgment action to enforce the non-time-limited restriction against non-residential use contained in the recorded declaration. The trial court enjoined the Defendant's proposed commercial use, concluding that the Defendant's property was—through the declaration—subject to an implied negative reciprocal easement that prohibited non-residential use. The Court of Appeals affirmed. We hold that the developers lacked the authority to impose the declaration's restrictions upon the Defendant's property because they did not own those lots when they executed and recorded the declaration. We further hold that the developers' mere re-acquisition and re-sale of some of the Defendant's lots after the recording of the declaration did not retroactively restrict the Defendant's property through the declaration. Accordingly, we reverse the decision of the Court of Appeals.

**Tenn. R. App. P. 11 Appeal by Permission;
Judgment of the Court of Appeals Reversed;
Remanded to the Chancery Court**

———————————————

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Edward T. Brading, Johnson City, Tennessee, for the appellant, Mark Hatfield.

Ricky A.W. Curtis, Blountville, Tennessee, for the appellees, Ritchie and Roma Phillips.

**OPINION**

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mark Hatfield ("the Defendant") owns land in Bristol, Tennessee along U.S. Highway 11E, a divided highway known at that location as Volunteer Parkway.[2] The Defendant purchased the land through two transactions, one in late 2016 and the other in early 2017. The local property assessor has classified the land as commercial since the early-to-mid 1990s. The City of Bristol has zoned the property as "General Business," which permits retail business. Having purchased the property, the Defendant proposed to raze an existing structure, construct a new building and parking lot, and open a retail business known as Intimate Treasures. The business would offer for sale at least some percentage of "adult novelty items."

Ritchie and Roma Phillips ("the Plaintiffs") own land in Bristol at 104 Sunnybrook Drive. The Plaintiffs reside in a home on this property. Sunnybrook Drive intersects Volunteer Parkway. The Defendant's property is situated at the intersection, abutting both Volunteer Parkway and Sunnybrook Drive. The Plaintiffs' property abuts Sunnybrook Drive and lies immediately up the street from the Defendant's property. The Plaintiffs' property shares a property line with a portion of the Defendant's property.

The Plaintiffs' property and the Defendant's property are comprised of various platted lots, or portions thereof, in a subdivision known as Sunnybrook Addition.[3] Sunnybrook Addition was platted in 1953 by the then-owners of the land comprising the subdivision, J.C. and Mary Virginia Chambers ("the Chambers"). Sunnybrook Drive is a path of ingress into the subdivision from Volunteer Parkway.

---

[2] The address for this property is referred to in the record as 1926 Volunteer Parkway.

[3] There are various spellings of Sunnybrook Addition in the record. We will use only Sunnybrook Addition for the sake of consistency.

Aggrieved by the Defendant's plan to open a retail business on his property, the Plaintiffs filed suit seeking an injunction and a declaratory judgment that certain restrictive covenants prohibit non-residential structures on the Defendant's land.[4]  According to the Plaintiffs, the Chambers recorded "Protective Covenants" in 1955 ("the 1955 Restrictive Covenants") that purported to cover all lots in the subdivision and to "run with the land," in other words to bind remote grantees or successive purchasers.  The 1955 Restrictive Covenants consisted of fourteen paragraphs that specified a variety of restrictions, from building setbacks, to minimum dwelling sizes, to prohibitions on the keeping of livestock and poultry.  Chief among them for purposes of this appeal was a provision governing "land use and building type."  The provision designated all lots as residential and prohibited the erection of any structure other than a single-family dwelling.  In their Complaint, the Plaintiffs alleged that the Defendant's proposed construction would violate this covenant.

At a hearing on the Plaintiffs' request for a temporary injunction and later again at trial, the parties presented copious proof—much of it documentary—on the history of Sunnybrook Addition, other related subdivisions, the Defendant's property, conveyances of various lots in Sunnybrook Addition, and restrictive covenants.  We will endeavor to simplify the proof.

The Chambers acquired a 417-acre tract of land in 1946.  On a portion of that land, the Chambers set out to develop the subdivision known as Sunnybrook Addition.  To that end, the Chambers recorded a plat for Sunnybrook Addition in 1953, dividing the subdivision into eight sections or blocks, ranging in size from five to sixteen lots.  The subdivision contained a total of seventy-nine lots.  The plat did not restrict the lots to residential use.

Over the course of 1953 and 1954, the Chambers sold sixty-seven of the seventy-nine lots.[5]  Included in the deeds conveying the vast majority of those lots were four expressly stated restrictive covenants ("the Original Restrictive Covenants"):

(1)     The property was to be used for residential purposes only;

---

[4] In his Answer and Counterclaim, the Defendant sought a declaratory judgment that the restrictive covenants at issue are "invalid and inapplicable" to his property.

[5] The Chambers sold the first lots as they were recording the plat.  The record does not reveal when the Chambers sold the twelve lots that remained in their ownership as of the recording of the 1955 Restrictive Covenants.

(2)     Any dwelling house was subject to a minimum square footage requirement;

(3)     No outside toilets were permitted; and

(4)     There were setbacks for the building of homes in reference to various property lines.

The language of the deeds provided that the covenants ran with the land.  The deeds also contained a statement that the covenants were binding for a period of only twenty years.[6]

Sunnybrook Addition section B-2 is comprised of eight lots.  The Plaintiffs own a portion of lots seven and eight.  The Defendant owns lots one, two, three, and a portion of lot four.  All of the parties' lots were among those conveyed by the Chambers during the course of 1953–54.[7]

The initial deeds for all of the parties' lots—from the Chambers as grantors to the various initial grantees in 1953—contained the Original Restrictive Covenants.  However, by the terms of the deeds, the covenants were binding for a period of only twenty years.  Thus, it is uncontested that the express residential-use restriction contained in the deeds for the Defendant's property terminated by its own terms long ago.

Each of the Defendant's lots was conveyed multiple times between the initial sale in 1953 and when the Defendant purchased it.  Lot one was sold by the Chambers in 1953 and remained in the hands of that purchaser until August 8, 1956, when the purchaser sold the lot back to the Chambers.  Lot two was sold by the Chambers in 1953, and was sold three more times before it also was sold back to the Chambers on May 21, 1956.  After the Chambers reacquired lots one and two in 1956, the lots were always conveyed together.  The Chambers re-sold lots one and two in 1960, and the lots were conveyed four more times before the Defendant bought them in 2016.

---

[6] In two separate transactions in late 1954, having already conveyed dozens of lots subject to the Original Restrictive Covenants, the Chambers conveyed three lots and a portion of a fourth lot with no restrictions listed in the deeds.  The record does not reveal why the Chambers conveyed this property without the deed restrictions.

[7] In fact, all eight lots that comprise Sunnybrook Addition section B-2 were among the first to be sold in 1953.

- 4 -

The Chambers sold lots three and four to Standard Advertising Corporation in 1953.[8]  They remained in the hands of the corporation until 1983, when the corporation dissolved and sold lot three and a portion of lot four together.  Thereafter, lot three and the portion of lot four were sold together three more times before the Defendant purchased them in 2017.

The crux of the controversy in this case involves the 1955 Restrictive Covenants.  On May 3, 1955, the Chambers recorded the 1955 Restrictive Covenants,[9] even though by then they had already sold the vast majority of lots in Sunnybrook Addition.[10]  Nevertheless, the 1955 Restrictive Covenants purported "to cover the Sub-division Plot as to lots in the entire Sub-division, but no further or otherwise," and they specifically stated they were to "run with the land."  As previously mentioned, among the covenants was a restriction as to "land use and building type:"

> All lots in the tract shall be known and designated as residential lots.  No structure shall be erected, altered or placed or permitted to remain on any lot other than one detached single family dwelling not to exceed two stories in height and a private garage for not more than two cars and usual domestic servants quarters.

By their terms, the 1955 Restrictive Covenants were to be binding for a definite period of time but were to renew automatically for successive ten-year periods unless a majority of the then-owners of the lots agreed to change the covenants.[11]

None of the deeds that conveyed the Defendant's property after May 3, 1955, incorporated or referred to the 1955 Restrictive Covenants.  Some of the deeds involving

---

[8] Coincidentally, the record reflects that there is a billboard located on lot three.  The record does not reveal exactly when the billboard came to be located on lot three, but it was before the Defendant acquired the lot.

[9] The Chambers executed the 1955 Restrictive Covenants on March 4, 1955, but recorded them on May 3, 1955.

[10] We reiterate that the deeds for nearly all of these conveyances, including those for all of the parties' lots, contained the Original Restrictive Covenants, which were still in effect when the Chambers recorded the 1955 Restrictive Covenants.

[11] In their Complaint, the Plaintiffs alleged that a majority of lot owners has never agreed to change the residential-use provision of the 1955 Restrictive Covenants.  The record reveals nothing further on this point.

the Defendant's predecessors-in-title contained no restrictive language at all. In fact, the deed by which the Chambers re-sold lots one and two in 1960 after they had reacquired the lots in 1956 contained no restrictive language whatsoever. On the other hand, some of the deeds involving the Defendant's predecessors-in-title contained general language that the conveyance was subject to valid restrictive covenants of record, if any. In fact, the 2016 and 2017 deeds conveying the properties to the Defendant stated: "This conveyance is made subject to valid restrictive covenants and easements, if any, appearing of record."

At trial, the Defendant offered evidence that the 1955 Restrictive Covenants did not appear in the chain of title to his property. The Defendant's witness in this regard explained that the Chambers had sold the lots in question before recording the 1955 Restrictive Covenants. The witness testified that in the case of restrictions recorded after a conveyance, it was standard practice for the parties to a conveyance to join and expressly recognize that the property will be encumbered by the restrictions. That practice did not occur with respect to what became the Defendant's property.[12]

The Defendant's witness also offered testimony about related subdivisions. The Sunnybrook Addition plat showed two adjacent areas of land in the name of J.C. Chambers. The record reveals that the Chambers, after platting Sunnybrook Addition in 1953, platted two additional subdivisions adjacent to Sunnybrook Addition. The Chambers recorded the plat for Sunnybrook Acres Addition in February 1956, and they recorded the plat for Sunnybrook Heights Addition in May 1956. Contemporaneous with the recording of the plats, the Chambers recorded "Protective Covenants" for each subdivision. These covenants were nearly identical to the 1955 Restrictive Covenants—including the residential-use restriction—and like the 1955 Restrictive Covenants, they contained language expressly stating that the covenants were to run with the land and "to cover the subdivision plot as to lots in the entire subdivision, but no further or otherwise."[13] However, unlike the circumstances surrounding Sunnybrook Addition lots and the 1955 Restrictive Covenants, the Defendant's proof showed that for conveyances of lots in the subsequently-platted subdivisions, the deeds stated that the conveyance was subject to the restrictions placed on those subdivisions and referenced the miscellaneous book page where the applicable restrictive covenants were recorded.

---

[12] Furthermore, the Defendant's witness testified that even after the recording of the 1955 Restrictive Covenants, the Chambers conveyed some lots through deeds that still listed the Original Restrictive Covenants.

[13] The witness confirmed on cross-examination that the three developments are commonly known simply as Sunnybrook, but the witness reiterated that each set of restrictive covenants specifically stated that it covered the lots in the individual subdivision and no further.

After hearing all of the evidence, the trial court concluded that the Defendant's property was restricted to residential use and entered a declaratory judgment in favor of the Plaintiffs. The basis for the trial court's ruling was a conclusion that the Defendant's property was subject to an implied negative reciprocal easement through the 1955 Restrictive Covenants. In reaching this conclusion, the trial court found that:

(1)     the Chambers were the original developers of and common grantor for the Sunnybrook neighborhood, comprised of the three platted developments of Sunnybrook Addition, Sunnybrook Acres, and Sunnybrook Heights;

(2)     the Chambers had a general plan of development for Sunnybrook and recorded nearly identical restrictive covenants for all three subdivisions;

(3)     the Chambers intended for the 1955 Restrictive Covenants to apply to all of Sunnybrook Addition; and

(4)     the Defendant acquired his property "subject to valid restrictive covenants . . . appearing of record" and "had, at a minimum, constructive notice of the restrictions owing to their public recording and due to the general nature of the property."

Accordingly, the trial court enjoined the Defendant from constructing any retail business or commercial enterprise on his property.

Upon the Defendant's appeal, the Court of Appeals reviewed "whether the trial court properly found the existence of an implied negative reciprocal easement." Phillips v. Hatfield, No. E2019-00628-COA-R3-CV, 2019 WL 6954182, at *4 (Tenn. Ct. App. Dec. 18, 2019), perm. app. granted, (Tenn. July 17, 2020). The Court of Appeals concluded that the evidence did not preponderate against the trial court's findings related to the elements of establishing an implied negative reciprocal easement:

(1)     that the parties derived their titles from a common grantor;

(2)     that the common grantor had a general plan for the property involved;

(3)     that the common grantor intended for the restrictive covenant to benefit the property involved; and

(4)     that the grantees had actual or constructive knowledge of the restriction when they purchased their parcels.

Id. at *4 (citing Ridley v. Haiman, 47 S.W.2d 750, 755 (Tenn. 1932)).  The intermediate appellate court concluded that the evidence established "that an implied reciprocal negative easement existed . . . , such that [the Defendant's] lots were subject to the residential-use restriction contained in the [1955 Restrictive Covenants]."  Id. at *6.  Accordingly, the court affirmed the trial court's judgment.  Id. at *8.

We granted the Defendant's application for permission to appeal.  In this Court, the Defendant argues that the 1955 Restrictive Covenants do not apply to his property; that even if the 1955 Restrictive Covenants apply to his property, he lacked notice when he purchased the property; and that even if he had notice, any restriction against non-residential use has been abandoned.  We need not reach all of the Defendant's arguments to resolve this appeal.  For the reasons set forth below, we hold that the 1955 Restrictive Covenants do not apply to the Defendant's property.

## II.     ANALYSIS

This case revolves around private restrictions on the use of land.  Such restrictions undoubtedly have a complex history of terminology.  See Citizens for Covenant Compliance v. Anderson, 906 P.2d 1314, 1316 (Cal. 1995) (referring to the historical law of real covenants, equitable servitudes, and easements as "an unspeakable quagmire" (quoting Edward H. Rabin, Fundamentals of Modern Real Property Law 489 (1974))).  We do not intend to untangle that complexity in this opinion.  Instead, we will identify terms and concepts relevant to this appeal, and we will attempt to employ consistent terminology throughout the opinion when possible.

In the context of this case, a covenant is quite simply "a solemn or formal obligation."  Restatement (Third) of Prop.: Servitudes § 1.3 cmt. a (Am. L. Inst. 2000).  Covenants are characterized by the nature of the performance called for, typically referred to as the "burden" of the covenant.  Id. § 1.3 cmt. e.  More specifically, an "affirmative covenant" calls for the performance of some act, whereas a "negative covenant" calls for the covenantor to refrain from doing some act.  Id. § 1.3(2).  If the nature of a negative covenant limits the uses that can be made by an owner or occupier of land, the covenant is

- 8 -

often termed a "restrictive covenant." Id. § 1.3(3). A "negative easement" is a restrictive covenant, that is to say, it is an obligation that limits the use of land. Id.

A covenant is binding on the covenantor but not necessarily binding on others. Id. § 1.3 cmt. a. However, when a successor to land is required to abide by a restrictive covenant even without assumption of that obligation, the burden of a restrictive covenant is said to "run with the land." In other words, it passes automatically with the land when ownership or possession changes, whether or not the successor consents. Id. §§ 1.1 cmt. b, 1.3 cmt. d. The interest in land with which the burden runs is referred to as the "burdened" or "servient" estate. Id. § 1.1(1)(c).

When the burden of a restrictive covenant runs with the land, the covenant qualifies as a "servitude." Id. §§ 1.3(1), 5.1 cmt. a. Servitude is a generic term that describes legal devices that private parties use to create rights and obligations that run with land, which are useful precisely "because they create land-use arrangements that remain intact despite changes in ownership of the land." Id. § 1.1(1), 1.1 cmt. a. For instance, servitudes "permit the creation of neighborhoods restricted to particular uses." Id. § 1.1 cmt. a. Generally speaking, a restrictive covenant runs with the land—in other words, qualifies as a servitude—if it is intended to do so, has been effectively created, is not invalid for certain reasons, and has not terminated in certain ways. Id. § 1.3 cmt. a.

Servitudes include a variety of devices, including covenants, easements, and profits. Id. § 1.1 cmt. d. We acknowledge that Tennessee caselaw has often referred to "negative easements," "negative reciprocal easements," and "implied negative reciprocal easements." See, e.g., Massey v. R.W. Graf, Inc., 277 S.W.3d 902, 909–11 (Tenn. Ct. App. 2008). The Restatement makes clear that in spite of historical differences, "[a] 'negative' easement, the obligation not to use land in one's possession in specified ways, has become indistinguishable from a restrictive covenant." Restatement (Third) of Prop.: Servitudes § 1.2 cmt. b. See also id. § 1.2 cmt. h (explaining historical differences between the concepts). In this opinion, we predominantly will use "restrictive covenant" to refer to the device that the Chambers recorded in 1955 that purported to prohibit non-residential land use throughout Sunnybrook Addition. However, some of the caselaw cited and quoted herein uses "negative easement" terminology.

### A.      Standard of Review

The case before us is a declaratory judgment action. See generally Tenn. Code Ann. §§ 29-14-102 & -103 (2012) (empowering a court to declare parties' rights under instruments such as a deed). It was tried without a jury before the Sullivan County

Chancery Court. We review a non-jury case de novo on the record with a presumption of correctness as to the findings of fact of the trial court, unless the evidence preponderates otherwise. Kelly v. Kelly, 445 S.W.3d 685, 691–92 (Tenn. 2014); Rogers v. Louisville Land Co., 367 S.W.3d 196, 204 (Tenn. 2012); Tenn. R. App. P. 13(d). For evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect. C-Wood Lumber Co. v. Wayne Cnty. Bank, 233 S.W.3d 263, 272 (Tenn. Ct. App. 2007); Realty Shop, Inc. v. RR Westminster Holding, Inc., 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Because the trial court is able to observe witnesses as they testify, appellate courts afford deference to the trial court's credibility assessments of live, in-court testimony. Kelly, 445 S.W.3d at 692; Wells v. Tenn. Bd. of Regents, 9 S.W.3d 779, 783–84 (Tenn. 1999). On the other hand, when evaluating documentary proof, the ability of an appellate court to assess the evidence is the same as that of the trial court, and thus there need be no deference afforded to the trial court's assessment. Kelly, 445 S.W.3d at 693; Wells, 9 S.W.3d at 783–84. Of course, we review questions of law de novo with no presumption of correctness. Kelly, 445 S.W.3d at 692; Rogers, 367 S.W.3d at 204.

### B. General Principles Concerning Restrictive Covenants

The central issue in this case is whether the Defendant's property is restricted to residential use. It is clear that for a period of time from the 1950s to the 1970s, what is now the Defendant's property indeed was restricted to residential use by virtue of the Original Restrictive Covenants. However, by its own terms, this restriction terminated after twenty years—long before the Defendant acquired his property. The only other potential source of restriction is the 1955 Restrictive Covenants. Thus, the heart of this case is whether the 1955 Restrictive Covenants apply to the Defendant's property.

As we evaluate this issue, we begin with a well-established principle of Tennessee law: "A property owner's right to own, use, and enjoy private property is a fundamental right." Hughes v. New Life Dev. Corp., 387 S.W.3d 453, 474 (Tenn. 2012) (citing McArthur v. E. Tenn. Nat. Gas Co., 813 S.W.2d 417, 419 (Tenn. 1991); State v. Gainer, 22 Tenn. (3 Hum.) 39, 40 (1842)). Long ago, this Court stated:

> [E]very proprietor of land, where not restrained by covenant or custom, has the entire dominion of the soil and the space above and below to any extent he may choose to occupy it, and in this occupation he may use his land according to his own judgment, without being answerable for the consequences to an adjoining owner, unless by such occupation he either

- 10 -

> intentionally or for want of reasonable care and diligence inflicts upon him an injury.

Humes v. Mayor of Knoxville, 20 Tenn. (1 Hum.) 403, 407 (1839). "Not surprisingly, then, Tennessee law does not favor restrictive covenants, because they are in derogation of the rights of free use and enjoyment of property." Hughes, 387 S.W.3d at 474–75.

Nevertheless, we have recognized that an owner of land does have the authority to "sell portions thereof and make restrictions as to the use for the benefit of himself as well as those to whom he sells other portions of the land." Laughlin v. Wagner, 244 S.W. 475, 476 (Tenn. 1922). See also Hughes, 387 S.W.3d at 475 (noting that the concept of a developer employing restrictive covenants to privately control land use is well-recognized). In fact, we have stated that there is "good reason" for the authority to impose restrictive covenants "when applied to the common practice of inserting in deeds a restriction such as tends to create a residential section against those uses which would tend to mar the beauty and detract from the value of the property by uses inconsistent with the uses intended." Laughlin, 244 S.W. at 477.

However, because such restrictive covenants are in derogation of the right to free use and enjoyment of property, Tennessee courts construe them strictly. Hughes, 387 S.W.3d at 481 (citing Williams v. Fox, 219 S.W.3d 319, 324 (Tenn. 2007); Arthur v. Lake Tansi Vill., Inc., 590 S.W.2d 923, 927 (Tenn. 1979)). Thus, "if the right to enforce the covenant as to other property is doubtful such right will be denied." Shea v. Sargent, 499 S.W.2d 871, 874 (Tenn. 1973) (quoting S. Advert. Co. v. Sherman, 308 S.W.2d 491, 493 (Tenn. Ct. App. 1957)). Similarly, we have stated that any doubt concerning the applicability of a restrictive covenant will be resolved against the restriction and in favor of the property's unrestricted use. Hughes, 387 S.W.3d at 481 (citing Massey, 277 S.W.3d at 908; Parks v. Richardson, 567 S.W.2d 465, 467–68 (Tenn. Ct. App. 1977)). Likewise, when the terms of a restrictive covenant can be construed in more than one way, courts must resolve any ambiguity against the party seeking to enforce the restriction and in a manner that advances the unrestricted use of the property. Id. (citing Williams, 219 S.W.3d at 324).

### C. The 1955 Restrictive Covenants

The record reflects that when the Chambers executed and recorded the 1955 Restrictive Covenants—the only potential source of restriction for the Defendant's property in this case—they did not own any of the parties' lots. Under these circumstances, there is a fundamental flaw in the Plaintiffs' attempt to burden the Defendant's property

through the recording of the 1955 Restrictive Covenants. As we mentioned above, for a restrictive covenant to qualify as a servitude and run with the land, the covenant not only must have been intended to run with the land, it also must have been created effectively. Restatement (Third) of Prop.: Servitudes § 1.3 cmt. a. Of keen importance under the circumstances of this case, to create a servitude, "the grantor must own the servient estate." Id. § 2.1 cmt. b, note. Cf. id. § 2.13, note (observing in the context of servitudes implied by reference to a plat or map that "[u]nless the grantor has the power to create the servitude, there would be no point to implying the servitude").

In recognition of this precept, courts from other jurisdictions have held that a person cannot restrict the use of another's land simply by recording restrictive covenants that purport to apply to that land. Birdwood Subdivision Homeowners' Ass'n v. Bulotti Constr., Inc., 175 P.3d 179, 183 (Idaho 2007) ("It is axiomatic that one person cannot unilaterally restrict the use of another's land simply by drafting and recording restrictive covenants allegedly applicable to that land."); Ruder v. Ohio Valley Wholesale, Inc., 736 N.E.2d 776, 781 (Ind. Ct. App. 2000) (finding restrictions that were recorded by the developer after the sale of certain lots inapplicable to those lots); Pollock v. Ramirez, 870 P.2d 149, 152 (N.M. Ct. App. 1994) (stating that a declaration of covenants filed when the grantors no longer owned the property did not validly impose restrictive covenants); White v. Cordes, 685 S.W.2d 524, 525 (Ark. Ct. App. 1985) (holding that a person who had no title in the land they sought to burden could not validly impose restrictions); Arnold v. Chandler, 428 A.2d 1235, 1237 (N.H. 1981) (finding irrelevant a declaration of restrictions recorded under the name of a corporation that did not have title to the land).

Likewise, our court of appeals also has recognized that a person cannot validly impose restrictions on property it does not own simply by recording restrictive covenants that purport to apply to that property. In Graham v. Edmondson, No. 01A01-9809-CH-00482, 1999 WL 476466, at *1 (Tenn. Ct. App. July 12, 1999), a developer acquired title to a large tract of land that eventually became a neighborhood known as Bluff Road Acres. Shortly after acquisition, the developer sold two smaller tracts within the larger tract. After that sale, the developer executed and recorded a declaration of restrictive covenants that purported to cover all of Bluff Road Acres, including the two smaller tracts. Years later, the defendant acquired part of one of the two smaller tracts. Id.

When the defendant took actions allegedly in violation of the restrictive covenants, the plaintiff homeowner in Bluff Road Acres brought suit to enforce the restrictions. Id. at *2. The defendant "claim[ed] her property [wa]s not subject to the restrictive covenants because it was deeded to her predecessor in title prior to the placement of the restrictions on the property." Id. Our court of appeals addressed "the power of a developer to bind

- 12 -

property it <u>does not own</u> by filing a subdivision plat which includes restrictive covenants." <u>Id.</u> at \*4. The court stated that the restrictive covenants "must be confined to the property as it existed at the time of the covenant[s]." <u>Id.</u> (emphasis removed) (quoting <u>Sherman</u>, 308 S.W.2d at 493). Because the developer sold the land that became the defendant's property before recording the restrictive covenants, the court concluded that the defendant's property was not burdened by the restrictions. <u>Id.</u>

In this case, it is true that the language of the 1955 Restrictive Covenants purported to cover all lots in Sunnybrook Addition. However, the Chambers did not own lots one through four when they recorded the 1955 Restrictive Covenants. Therefore, the inescapable conclusion is that the Chambers lacked the authority to impose a servitude on the land that became the Defendant's property simply through recording the 1955 Restrictive Covenants.

The land that eventually became the Defendant's property changed hands multiple times after the 1955 Restrictive Covenants were recorded. In each instance, the grantor obviously would have had the authority to burden the property. Accordingly, we will briefly address whether any of these conveyances exhibited an intent on the part of the grantor to impose the 1955 Restrictive Covenants as a servitude.

In our view, none of the conveyances after the recording of the 1955 Restrictive Covenants subjected the Defendant's property to the restrictions. None of the deeds for these conveyances incorporated or referred to the 1955 Restrictive Covenants. Some of the deeds made no mention of any potential restrictions whatsoever. In fact, the deed by which the Chambers re-sold lots one and two in 1960 contained no restrictive language at all. This circumstance stands in stark contrast to the proof in the record that with respect to the related subdivisions platted in 1956, the Chambers conveyed lots with specific language in the deeds subjecting the lots to the restrictive covenants they had recorded for the subdivisions.

We acknowledge that some of the deeds—including the specific deeds by which the Defendant came to acquire his property—contained language that the conveyance was subject to valid restrictive covenants, if any, appearing of record.[14] Under the circumstances of this case, however, we do not believe this general language reflects sufficient intent on the part of any grantor subsequent to the recording of the 1955 Restrictive Covenants to subject the property to the unnamed restrictions, which did not

_____

[14] This language in no way remedies the fact that the Chambers lacked the authority to burden lots one through four when they recorded the 1955 Restrictive Covenants.

- 13 -

appear in the property's chain of title, given that we must resolve any doubt against the existence of the restriction.[15]  See Hughes, 387 S.W.3d at 481; Shea, 499 S.W.2d at 874. See also Restatement (Third) of Prop.: Servitudes § 2.2 cmt. d ("Courts are justifiably hesitant to find the intent to create servitudes in vague language or informal writings because servitudes create interests running with the land that affect people beyond the immediate parties.").

Nevertheless, looking to the elements of an implied negative reciprocal easement, the Plaintiffs argue—as the courts below found—that the 1955 Restrictive Covenants apply to the Defendant's property.  We respectfully disagree.

Tennessee recognizes negative reciprocal easements.  The concept is reflected in the following language from this Court:

> The general rule is that, where the owner of a tract of land subdivides it and sells the different lots to separate grantees, and puts in each deed restrictions upon the use of the lot conveyed, in accordance with a general building, improvement, or development plan, such restrictions may be enforced by any grantee against any other grantee.

Ridley v. Haiman, 47 S.W.2d 750, 753 (Tenn. 1932).  The concept is concerned primarily with "[w]hether a person not a party to a deed containing a restrictive covenant is entitled to enforce that covenant."  Id.

The doctrine of implied negative reciprocal easements is an extension of the original concept that addresses circumstances in which the creation of a servitude on certain land is not expressly apparent and, therefore, must be implied.  Under the doctrine, the creation of a servitude can be implied by virtue of, among other circumstances, the conveyance of land pursuant to a general plan of development.  See Restatement (Third) of Prop.: Servitudes § 2.14.  The quintessential example occurs in the context of restrictive covenants applicable to a residential subdivision.  See id. § 2.14 cmt. a & b.  The Restatement explains the doctrine as follows:

> The idea underlying the doctrine is that when a purchaser buys land subject to restrictions imposed to carry out a general plan of development, the

---

[15] Because we conclude that none of these conveyances exhibited an intent to apply the 1955 Restrictive Covenants to the Defendant's property, we need not address whether the Plaintiffs would be in a position to enforce the restrictions.

- 14 -

purchaser is entitled to assume that all land in the development is, or will be, similarly restricted to carry out the general plan. By selling land with restrictions designed to put into effect a general plan of development, the developer impliedly represents to the purchasers that the rest of the land included in the plan is, or will be, similarly restricted. That representation is enforced, on the grounds of estoppel, by imposing an implied reciprocal servitude <u>on the developer's remaining land included in the plan</u>.

Id. § 2.14 cmt. i (emphasis added). The Restatement summarizes the application of the doctrine as follows: "A conveyance by a developer that imposes a servitude on the land conveyed to implement a general plan creates an implied reciprocal servitude burdening <u>all the developer's remaining land included in the general plan</u>, if injustice can be avoided only by implying the reciprocal servitude." Id. § 2.14(2)(b) (emphasis added).

"Creation of servitudes by implication normally arises on severance of a single possessory interest into two or more possessory interests." Id. § 2.11 cmt. d. For that reason, the Restatement makes clear that the servitude becomes effective "when the first conveyance of a lot or unit is made pursuant to the development plan." Id. § 2.7 cmt. f.

Tennessee law recognizes the implied negative reciprocal easement doctrine. For instance, in Land Developers, Inc. v. Maxwell, 537 S.W.2d 904 (Tenn. 1976), we reiterated the principles of negative reciprocal easements: that when a property owner subdivides land and sells lots with deed restrictions in accordance with a general plan, the restrictions may be enforced by any grantee against any other grantee. 537 S.W.2d at 912. We went on to state: "Likewise, the property remaining in the hands of the vendor may also be held in equity to be subject to a servitude so as not to be used in a manner different from that contained in the restrictions." Id. Thus, in Maxwell, when considering the question of "whether or not like or reciprocal easements or restrictions upon use may be imposed, in equity, upon the property remaining in the hands of the grantor, and those who stand as successors or assigns of the grantor," we had:

no hesitancy in holding that the unsold lands of [the developer] were restricted in his hands by essentially the same covenants as he had imposed in the deeds to his various grantees, by an equitable servitude, because there seems to be little question but that he did intend a general plan for the development of the entire area as a residential "suburb" or subdivision.

Id. at 913. See also Arthur, 590 S.W.2d at 928 (recognizing that restrictive covenants may be implied pursuant to a general plan or scheme of development).

- 15 -

The doctrine "undercuts the Statute of Frauds and creates uncertainty in land titles." Restatement (Third) of Prop.: Servitudes § 2.14 cmt. i. Thus, we have stated that the doctrine "is to be applied with great care." Maxwell, 537 S.W.2d at 913 (citing McCurdy v. Standard Realty Corp., 175 S.W.2d 28, 30 (Ky. 1943) (stating that the "doctrine ought to be used and applied with extreme caution")).

As is evident from the discussion above, the factual scenario presented in this case, at least with respect to the 1955 Restrictive Covenants, is not the typical one recognized under the implied negative reciprocal easement doctrine.[16] Rather, what initially occurred during the development of Sunnybrook Addition vis-à-vis the implementation of the twenty-year residential use restriction by virtue of the Original Restrictive Covenants is the typical scenario historically addressed by the implied negative reciprocal easement doctrine. The Chambers owned all of the land comprising Sunnybrook Addition as of 1946, recorded a plat for the subdivision in 1953, and sold sixty-seven of seventy-nine lots over the course of 1953–54. The deeds for nearly all of these conveyances, including all of those that occurred in 1953, expressly listed the Original Restrictive Covenants. The implied negative reciprocal easement doctrine would operate to subject the lots remaining in the hands of the Chambers to the time-limited Original Restrictive Covenants.[17] See Maxwell, 537 S.W.2d at 912–13; Restatement (Third) of Prop.: Servitudes § 2.14(2)(b).

The factual scenario was markedly different by the time the Chambers recorded the 1955 Restrictive Covenants. By then, the Chambers had conveyed the vast majority of lots, and they owned none of the parties' lots. So far as the record shows, the land remaining in the hands of the Chambers at the time they recorded the 1955 Restrictive Covenants consisted of only twelve of seventy-nine lots, spread sporadically through only

---

[16] In fact, the Restatement suggests that the implied negative reciprocal easement doctrine ordinarily does not come into play when the developer records a declaration of servitudes applicable to an entire general-plan area. Restatement (Third) of Prop.: Servitudes § 2.14 cmt. i. See also Walters v. Colford, 900 N.W.2d 183, 194 (Neb. 2017). In such circumstances, there is no need to imply the existence of a general plan or the application of restrictions to land not otherwise mentioned in relevant documents— such as deeds—because the written declaration precisely evidences the intent to subject specific parcels of land to the servitudes pursuant to a general plan. Regardless, because the courts below focused on the doctrine of implied negative reciprocal easements, we will address the purported application of the doctrine.

[17] Obviously, the issue in this case was never whether the lots remaining in the hands of the Chambers upon their initial 1953 conveyances were subject to the Original Restrictive Covenants, and we do not hold they were. We merely are observing that the facts in the record pertaining to the initial development of Sunnybrook Addition are akin to the typical implied negative reciprocal easement scenario.

six of the eight sections of Sunnybrook Addition—and not including the entire section that contained all of the parties' lots.

In the seminal case of Sanborn v. McLean, 206 N.W. 496 (Mich. 1925), the Michigan Supreme Court stated:

> [An implied negative reciprocal easement] must start with a common owner. Reciprocal negative easements are never retroactive; the very nature of their origin forbids. . . . If a reciprocal negative easement attached to defendants' lot, it was fastened thereto while in the hands of the common owner of it and neighboring lots by way of sale of other lots with restrictions beneficial at that time to it.

206 N.W. at 497. See also Dwyer v. City of Ann Arbor, 261 N.W.2d 231, 234 (Mich. Ct. App. 1977), rev'd on other grounds, 387 N.W.2d 926 (Mich. 1978) (stating that the "retroactive effect [of applying restrictions to land not owned by the grantor at the time the restrictions were created] is at odds with the reciprocal negative easement requirement of common ownership at the time the express restrictions are created"). Accord Hun Es Tu Malade? # 16, LLC v. Tucker, 963 So. 2d 55, 67 (Ala. 2006) (stating that "a negative reciprocal easement must attach, if at all, while the property is held by a common grantor"); Shipyard Prop. Owners' Ass'n v. Mangiaracina, 414 S.E.2d 795, 802 (S.C. Ct. App. 1992) (stating that "reciprocal negative easements are never retroactive"); Saccomanno v. Farb, 492 S.W.2d 709, 713 (Tex. Civ. App. 1973) ("A reciprocal negative easement is never retroactive."). Tennessee law is in accord with this principle. See E. Sevier Cnty. Util. Dist. v. Wachovia Bank & Trust Co., 570 S.W.2d 850, 853 (Tenn. 1978) (stating that "no set of covenants should be given any general retroactive effect"); Conn v. Powell, 1984 WL 588785, at *3 (Tenn. Ct. App. Nov. 5, 1984) (stating "that reciprocal negative easements are never retroactive").

The 1955 Restrictive Covenants purported to cover all lots in Sunnybrook Addition. However, the Chambers were the common grantor for the lots in Sunnybrook Addition in 1953, when they conveyed the first lots subject to the Original Restrictive Covenants. By the time of the recording of the 1955 Restrictive Covenants, the Chambers were no longer acting as the common grantor with respect to the parties' properties, for the Chambers did not then own those lots. Under these circumstances, we conclude that the 1955 Restrictive Covenants cannot burden the Defendant's property by virtue of an implied negative reciprocal easement. To hold otherwise would be to impose the 1955 Restrictive Covenants retroactively.

- 17 -

The Plaintiffs point out that the Chambers reacquired lots one and two in 1956. The record does not reveal why the Chambers reacquired the lots. We acknowledge there is a precedent for imposing an implied negative reciprocal easement after the re-acquisition of the subject property. Cook v. Bandeen, 96 N.W.2d 743 (Mich. 1959). In Cook, the defendants purchased an unsubdivided tract of land. The defendants moved to the property and began developing it. Id. at 744. They sold various lots, referring in the deeds to a description based on an unrecorded plat. Id. at 746. The deeds also contained an express restriction that the property was "to be used for dwelling purposes only and any dwelling house erected thereon is to cost not less than $5,000." Id.

Before the sale of any of the restricted lots, the defendants sold an unrestricted lot to a relative. After the sale of the restricted lots, the defendants reacquired the unrestricted lot. The defendants then sought to use the lot to expand a pre-existing trailer park, a use that apparently would violate the aforementioned restriction. Id. The court ultimately concluded that the lot was subject to the restriction by virtue of a negative reciprocal easement. Id. at 747–48.

Needless to say, we are not bound by Cook. However, we also believe it is distinguishable from the case before us. Aside from the obvious factual differences, we note that the Cook court imposed the restriction by estoppel based on a finding of fraud:

> We likewise believe, as did the chancellor, that for defendants to formulate such a plan [as reflected on the unrecorded plat], sell restricted lots in pursuance thereof, watch homes be built by their grantees in reliance thereon, and then purchase back an unrestricted lot in one of the same blocks and propose to use same for a commercial use, would constitute fraud, actual or constructive.

Id. at 747. There is no suggestion of fraud in the case before us. We further note that the Cook court acknowledged the rule of Sanborn v. McLean, that "a reciprocal negative agreement is never retroactive." Id. (citing Sanborn, 206 N.W. at 497). The court stated that the Sanborn rule would have required that the defendants' lot remain unrestricted were it not for the circumstances of fraud. Id.

In our view, when the Chambers reacquired lots one and two in 1956—after at least sixty-seven of the seventy-nine lots in the subdivision had been sold, some more than once—they stood in the same shoes as any other purchaser. They acquired lots one and two subject to the Original Restrictive Covenants, and they were free to use or sell the lots. We do not believe that the implied negative reciprocal easement doctrine can be stretched

- 18 -

to impose a restriction upon property when the grantor parted ways with it before attempting to impose the restriction, simply because the grantor reacquired it a year after recording the purported restriction.[18]  Thus, we conclude that the Chambers' re-acquisition and later re-sale of lots one and two did not trigger the imposition of the 1955 Restrictive Covenants as a servitude upon the Defendant's property.

Accordingly, in light of the discussion above, we are compelled to conclude that the 1955 Restrictive Covenants do not apply to the Defendant's property.  The Defendant is entitled to a declaratory judgment to that effect.

### III.    CONCLUSION

For the foregoing reasons, we reverse the decision of the Court of Appeals.  We hold that the Chambers lacked the authority to impose the 1955 Restrictive Covenants as a servitude upon the Defendant's property because they did not own the property when they executed and recorded the 1955 Restrictive Covenants.  We further hold that the 1955 Restrictive Covenants do not limit the Defendant's property to residential use through an implied negative reciprocal easement.  We remand the case to the Sullivan County Chancery Court for entry of a declaratory judgment that the 1955 Restrictive Covenants do not apply to the Defendant's property and for such other proceedings as are consistent with this opinion.

The costs of this appeal are taxed to the Plaintiffs, for which execution may issue if necessary.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE

---

[18] We note that the Chambers did not place any additional restrictions of record on lots one and two after they reacquired the lots.  We also reiterate that the Chambers never owned the Plaintiffs' lots, lot three, or the relevant portion of lot four after 1953.

- 19 -